CURWOOD *v.* PENINSULAR FIRE INSURANCE CO.

1. FRAUD—CORPORATIONS—TRIAL—INSTRUCTIONS.

In an action against a corporation for fraud in a sale of its corporate stock to plaintiff in which its defense was that the sale was made by another to whom the stock was sold by defendant, requests of defendant to charge, *held,* fully covered by the general charge so far as they were proper.

2. SAME—DEFRAUDED PARTY MAY RESCIND AND SUE FOR MONEY PAID.

The trial judge properly instructed the jury that in case of fraud, the defrauded party might rescind the contract, tender back what he had received and demand return of his money paid therefor, and, in case of its non-return, bring an action to recover same, with interest.

Error to Shiawassee; Collins (Joseph H.), J. Submitted January 29, 1924. (Docket No. 39.) Decided April 10, 1924. Rehearing denied June 2, 1924.

Case by James Oliver Curwood against the Peninsular Fire Insurance Company of America for fraud in the sale of corporate stock. Judgment for plaintiff. Defendant brings error. Affirmed.

*Rolland J. Cleland* (*Harry E. Rodgers,* of counsel), for appellant.

*Matthews & Hicks,* for appellee.

MOORE, J. It is the claim of the plaintiff that he bought 150 shares of stock belonging to the defendant company for $9,000; that he was induced to make the purchase by the fraudulent representation of defendant's agent. He sued to recover the money paid.

On liability of corporate officer for misrepresentations which induced the sale or purchase of stock, see note in 1 L. R. A. (N. S.) 258.

From a verdict and judgment in favor of the plaintiff the case comes into this court by writ of error.

The defense of the defendant is indicated by the notice attached to the plea of the general issue as follows:

"*First:* That on or about the 27th day of October, 1921, Colon C. Lillie, president of the defendant, entered into a certain contract in the name of this defendant, with L. M. Bach & Co., of Chicago, Illinois, wherein and whereby this defendant was to sell and did sell to the said L. M. Bach & Co., 3,000 shares of its capital stock, more or less, for the purpose of reselling the same to new purchasers and by reason of the old subscribers defaulting in their subscriptions for stock, and for which the said L. M. Bach & Co. were to pay the said defendant herein $37.50 for each share of stock sold.

"*Second:* That said L. M. Bach & Co. were not the agents or representatives of the said defendant in the sale of any stock to the plaintiff and that if any false or untrue statements were made by any person or persons to the plaintiff, in the sale of said stock, such statements and representations were unauthorized by this defendant.

"*Third:* That the said plaintiff in writing authorized the said L. M. Bach & Co. to procure for him 150 shares of the capital stock of said defendant, for which he agreed to pay $60 per share in cash, and that said application or authority so made and given to the said L. M. Bach & Co. further set forth and stated that no material representation had been made to the said plaintiff other than those contained therein.

"The defendant will further show in its defense and as a complete bar to any recovery under said declaration that it never received any money, security or other consideration for any stock issued to said plaintiff, and that the draft delivered to the agent of L. M. Bach & Company by the plaintiff for $9,000 was taken by said L. M. Bach & Company and by them cashed at the Lake State Bank in the city of Chicago upon the indorsement of L. M. Bach & Company and B. W. Singer.    A copy of said draft with indorsements thereon being as follows:

     " 'Citizens Savings Bank    24-169
      of Owosso
        " 'Owosso, Mich., Dec. 1, 1921.
        No. 62342.
" 'Pay to the order of J. O. Curwood $9,000 dollars.
Exactly nine thousand dollars and no cents.
To First and Old Detroit National Bank,
9-1 Detroit, Michigan.
      " 'BURR S. WOOD, 2nd. Asst. Cashier.
" 'Indorsements:
" 'Pay to the order of Peninsular Fire Ins. Co. James Oliver Curwood, (Colon C. Lillie, Pres. Peninsular Fire Insurance Co. of America.)' &ast; &ast; &ast;

"The said defendant will further show that no part or portion of the said nine thousand ($9,000) dollars was ever received or paid to the said defendant, or any of its authorized officers or agents for the use and benefit of said defendant."

So many of the assignments of error relate to the charge of the court and his failure to give many of the written requests preferred by the defendant, that we quote from the charge freely as follows:

"Gentlemen of the jury: This is an action of trespass on the case brought by James Oliver Curwood *vs.* The Peninsular Fire Insurance Company of America, a Michigan corporation, it being the claim of the plaintiff that on the first day of December, 1921, he purchased from an agent of said defendant, 150 shares of its stock, and that at the time of such purchase, said agent represented to him that the company was in a prosperous condition and that the market value of its stock was $100 per share; that the company would declare a 20 per cent. dividend in January, 1922, 10 per cent. of which would be placed in the surplus of the company and that 10 per cent. would be paid in cash to the stockholders thereof; that the accumulative profits of the company showed a surplus above its obligations of $76,000 according to its last report; that the profits of the company for the last year were 43 per cent. Plaintiff further claims that said defendant also made other representations through letters that had been received by him from said defendants prior to the time that he met defendant's

agent, Sang; that he believed such representations so made by defendant's agent, as well as those contained in letters, and acting upon such belief and because thereof, he purchased 150 shares of stock in the defendant company, and that he paid therefor the sum of $9,000 to said defendant company. That thereafter, he discovered that such representations were false and having been deceived thereby, he rescinded the purchase of said stock, tendered back the same to the defendant company, demanded his $9,000, and not having received same, is asking in this suit that such sum be awarded.

"Now the defendant has filed here a plea of the general issue, being a denial of all the material allegations contained in plaintiff's declaration; and more specially the defendant claims that it was not concerned in the sale to plaintiff of 150 shares of stock and that it had no part in such transaction. That the sale of the stock to plaintiff was made by Colon C. Lillie, Francis F. McGinnis and Bach & Company, as individuals for their own profit. That N. H. Sang, who sold the stock to plaintiff, Curwood, was not and never had been an agent of the defendant company, and therefore, they are in no way liable for any statement that he may have made to the plaintiff at the time such stock was sold. That Bach & Company of Chicago had charge of the sale of the stock in question, having purchased 3,000 shares from Lillie and McGinnis, and that Sang was the agent of Bach & Company, and so acted in selling to plaintiff, Curwood, 150 shares, being a portion of the 3,000 shares so sold to Bach & Company, and also that plaintiff constituted, L. M. Bach & Company his agent at the time he made the application to buy these shares to purchase such stock for him, and that the only part that the corporation itself had in this transaction was when Lillie and McGinnis found it necessary to advance their own interests to appropriate the corporate name and some of the property of the corporation, and this without any authority from the company itself.

"Now, gentlemen, in this case I charge you that the burden of proof is upon the plaintiff to prove by a preponderance of the evidence, that is, the weight of the evidence, all of the facts which are necessary to entitle him to recover. That is, the weight of the

evidence upon the part of the plaintiff must be greater than that upon the part of the defendant.    Now, this is not necessarily determined by the number of witnesses on each side; but in determining the credibility and what weight shall be given to the testimony of any witness, you may take into consideration the interest or lack of interest the witness has in the case, the manner in which the testimony is given, the appearance of the witness upon the stand, his apparent candor or lack of candor, and any other matter which in any way tends to convince you as to the truth or falsity of the testimony given.

"It is your duty to determine all questions of fact in this case, and such determination must be made by you from the evidence in the case.    The court has nothing to do with such determination, it being the duty of the court to determine all questions of law and to give you instructions thereon.    And you are to take the law as given to you by the court as true, and apply such law to the facts as determined by you and render your verdict accordingly.

"Now, gentlemen, one of the things for you to determine in this case is, whether there was a sale by Lillie and McGinnis to Bach & Company of 3,000 shares of defendant's stock mentioned in an agreement that was made by and between the Peninsular Fire Insurance Company of America, represented by Colon C. Lillie, president, and so signed by him, and L. M. Bach & Company of Chicago, a firm of brokers of that city, and signed by L. M. Bach for the company, such agreement bearing date October 27, 1921, and if so, whether the stock received by the plaintiff was a portion of that 3,000 shares.

"Now, in this connection, in order to find there was a sale of said stock to Bach & Company, it will be necessary for you to know what in law constitutes a sale.    A sale of goods is an agreement whereby the seller transfers the property to the buyer for a consideration, called the price, and to constitute a sale there must be—

"*First,* parties competent to contract;
"*Second,* a subject-matter or thing sold;
"*Third,* a price or consideration; and
"*Fourth,* mutual consent of the parties;
    226—Mich.—37.

and in determining the question of whether Bach & Company became the owner of these 3,000 shares of stock you will consider the agreement as made on the 27th of October, and also the evidence given here in relation to this matter by Mr. Bach and read to you from his deposition taken in Chicago, as well as the testimony in relation to the actions and doings of Bach & Company, and the men who sold this stock, and the men who sold the stock to Mr. Curwood, and the actions of Mr. Lillie, the manner and method by which Mr. Curwood's stock was paid for, and all the testimony in the case which can in any way throw any light on that question; and if, after such consideration, you should determine that this stock by reason of the sale, became the property of Bach & Company, then in such case, your verdict would be no cause of action, unless you should find that the defendant company, through its officers, assisted in the sale of such stock by making false representations in relation to it by correspondence carried on with the plaintiff prior to the purchase of the stock, or ratified the sale afterwards by action of the company, as I shall further instruct you.

"I further charge you, because it may be necessary in this case for you to determine whether there was a sale of this stock to Bach & Company or whether Bach & Company was acting as the agent of the defendant in the sale of this stock, that there is a distinction between the relation of principal and agent, and that of buyer and seller. In a sale, as I have said, title passes to the buyer; in agency title remains in the principal. So in determining this question, you may also take into consideration the evidence as to the manner and method in which the stock was transferred to the name of the buyer, and by the manner in which checks or drafts were drawn in payment thereof, and also what became of the money or property that was given for this stock at the time it was sold.

"In this connection, I will give you the definition of an agent. An agent is a person duly authorized to act on behalf of another, or one whose unauthorized act has been duly ratified. Another definition is, 'One who is employed by another to do some act or transact some business on his account.' The one who

authorizes the agent to act is called the principal, and the one who acts for the other is called the 'agent.'

"The definition of agency is, 'A contract, either express or implied, by which one of the parties confides to the other the management of some business to be transacted in his name or on his account, by which the other assumes to do the business and to render an account of it.'

"The defendant claims as I have said, that N. H. Sang is not its agent and did not act as such in the sale of this stock to the plaintiff.

"If you should find in this case that at the time that N. H. Sang sold this stock in question to the plaintiff in this case, he was not the agent of the defendant company, then I instruct you that the plaintiff cannot recover and your verdict would be no cause of action, unless you should find that the defendant company, by correspondence with the plaintiff, led plaintiff to believe that at the time N. H. Sang sold the stock to plaintiff, he was the agent of the defendant company, or that the defendant after the sale, ratified the action of Mr. Sang.

"Now, the burden of proof in this case rests upon the plaintiff to show that at the time N. H. Sang sold the stock to the plaintiff, he acted as and was at the time the agent of the defendant company, and that he made false representations in relation to such stock at the time of the sale. And in this connection, I charge you that any false representation of a material fact in relation to any article that one is attempting to induce another to purchase, and upon which that other acts, constitutes fraud and entitles the party deceived thereby to such damages as he has sustained because thereof.

"Now, in order for the plaintiff to recover, it is necessary for him to show by a preponderance of the evidence, that is, upon this question of false representation being made:

"*First*, that representations of a material fact were made by N. H. Sang;

"*Second*, that such representations were false;

"*Third*, that the plaintiff relied upon such representations and was deceived thereby; and

"*Fourth*, that such agent made such representations with the intention that they should be acted upon by plaintiff.

"Now, if plaintiff has failed to prove by a preponderance of the evidence any one of these things, then plaintiff could recover nothing here and your verdict would be no cause of action.

"I further charge you that where one makes false representations of material facts which are exclusively within his knowledge, and the other party relies upon them to his injury, liability for such false representations follow and the plaintiff is not required to make further investigation to ascertain whether the statements are true; and if representations of material facts are made and are relied upon by the other party, to his injury, an action for fraud may be maintained even though such representations are made in good faith.

"I further charge you in this case that if you should find that the plaintiff did not rely upon the statements made, but relied upon the judgment of himself or of others, then in such case your verdict would be no cause of action.

"I further charge you that it is not necessary for the plaintiff to prove every allegation of fraud or false representation set forth in the declaration. If he has satisfied you that one material allegation alleged and proven was false and produced in his mind a reliance upon such allegation then he would be entitled to recover. And in this connection, I also charge you that it is not necessary that the representation should have been the sole cause for the plaintiff purchasing the stock, if such representations exerted a material influence upon his mind and was one of the causes that led him to purchase the stock.

"I further charge you, gentlemen, that fraud cannot be presumed. The evidence must be such that it would naturally lead your mind to the conclusion that a fraud was committed, and there must be substantial evidence to prove it. However, like any other fact, it may be proven by circumstances which satisfy the mind of its existence.

"I further charge you that under the law of this State, it is not necessary in order to constitute fraud, that the person making the representations should either know that they are untrue or be recklessly and consciously ignorant whether it be true or untrue,

but it is sufficient if the representations be false in fact.

"I further charge you, that if you should find in this case that N. H. Sang was the agent of the defendant, and he made false representations to the plaintiff in relation to this stock, then the defendant here would be liable for such representations so made by his agent, because it is the rule that where an agent in selling goods for his principal, makes false representations in relation thereto, that are relied upon by the buyer and induce him to make the purchase, then the principal is liable to the buyer for such damages as he may have sustained because of the false representations on the part of his agent.

"I further charge you that if you should find that the representations were true or that they were not relied upon by defendant, then your verdict would be no cause of action.

"I charge you in this case that if you should find that the defendant or its agent, Sang, if you should find that he was its agent, represented that the market value of the stock of the Peninsular Fire Insurance Company was $100 a share, and that it had a surplus of $76,000, and that the company would declare a 20 per cent. dividend in January, 1922, and that the profits of the Fire Insurance Company were 43 per cent., or any one of these statements, and that the plaintiff relied upon such representations and bought the stock because they were made, and would not have bought it if they had not been made, and plaintiff believed them or any of them to be true, and you should further find that such representations were untrue and false, either one or all then in such case, plaintiff would be entitled to recover as to the false representations.

"As to any statements that were made in relation to the profits of other companies of a like nature, you will not consider in determining whether false representations were made or not, neither will you consider the statement that no amount of money would buy other stock, in determining whether false representations were made or not, as the court is of the opinion that these statements may not be considered by you as forming any basis for recovery in this case.

"The court is further of the opinion that the state-

ments claimed to have been made in Exhibit 1, being a circular sent out by Colon C. Lillie, wherein it stated that 'Today our company stands on the threshold of a phenomenal future, and a substantial increase of the value of our stock is certain to occur,' may not be considered by you as a basis for awarding any damages in this case, as the court instructs you that this statement is a matter of opinion and not of fact, such as, under the law, a recovery could be had for the making in case it were false.

"If you should find in this case that Sang was not the agent of the Peninsular Fire Insurance Company at the time he sold this stock to plaintiff, but should find that after such sale the defendant had information in regard to it and accepted and kept the proceeds thereof, that is the $9,000 after paying a commission to Bach & Company, then in such acceptance of the benefits the defendant is bound by the statements of Sang the same as though he had been its agent at the time of the sale, because by such action on the part of the company it would have ratified the sale to plaintiff by Sang and therefore would be liable for any false statements made by Sang at the time of such sale.

"If you should find from the evidence in this case that the plaintiff signed the so-called application for stock, without reading the same, as a result of various false representations made to him by the party presenting same, then I charge you that plaintiff is not bound by the terms of said application.    However, if you should determine there was no fraud in securing the signature of plaintiff to the application, or in causing him to make the application, then the plaintiff is bound by the application, and I instruct you that the application to L. M. Bach & Company to purchase 150 shares of the stock of the defendant constituted Bach & Company his agent for the purpose of such purchase, with authority to purchase any stock of the company owned by any person who could give a good and sufficient title thereto, and if L. M. Bach & Company acted as his agent in the purchase of this stock, then plaintiff cannot recover and your verdict would be no cause for action.

"Now, gentlemen, a corporation can only act through its officers.    In doing business with the public, the

stockholders as a body do not do the business of the corporation, but such business is necessarily intrusted to certain duly elected officials.    I charge you in this case that if Mr. Lillie, the president of this company, used the corporate name of the company and acting within the apparent scope of his authority as it appeared to plaintiff, for the purpose of consummating a fraud upon plaintiff in the sale of this stock to him, and received and indorsed the draft in payment thereof as president of the company and with the name of the company, then the defendant is liable for such action on the part of its president, if you should find that the plaintiff was deceived and suffered loss because of such action on the part of Mr. Lillie.

"Now, gentlemen, there is another phase of the case that I desire to instruct you in relation to and that is in regard to the circular letters.    In regard to these circular letters and the claim that the defendant held N. H. Sang to be their agent in this transaction, I charge you if you should find that the defendant held out to plaintiff that Sang was its agent and plaintiff believed him to be the agent of the company because of such action on the part of the defendant, then in such case the defendant would be estopped from denying that Sang was its agent, because a person is bound by the representations and acts of another as agent when there has been such a holding out as to reasonably lead one dealing with him to believe in the existence of such agency, but there must be conduct calculated to mislead and it must be under circumstances which justified the claim that the alleged principal should have expected that the representations be relied upon and acted upon, and further, it must appear that they were relied upon in good faith to the injury of the innocent party, and it must appear that the act of the agent was within the real or apparent scope of his authority. In order to apply this doctrine you must find all of these conditions existed here from the evidence, and in case you find they or any of these things did not exist, then you will not regard the question of estoppel further in this matter.

"I have been given some requests to charge by the different parties.    I do not give a great many of them because I think I have covered them by the general charge, that is, such as I think the law entitles to

be given.    When I give these requests if I do give any of them, they are to be regarded by you the same as though they had been incorporated in the general charge of the court and considered by you as the law.

"I think I will not give any of the plaintiff's requests. I give the second of the defendant's requests.

"I instruct you that the defendant corporation, like all corporations, has in the law a distinct existence of its own, separate and apart from the existence of its stockholders and officers.    And the corporation itself is not bound by or answerable for the acts or statements done or made by its stockholders or officers in their individual capacity and in their private interests.

"It is claimed that when Sang dealt with plaintiff on December 1, 1921, he had in his possession a license from the Michigan securities commission to sell the stock of the Peninsular Fire Insurance Company of America.    Regardless of whether Sang was selling this stock for the company or for Bach & Company or for Lillie personally or for any other person, it would be necessary for him to have such a license, and I instruct you that the fact that Sang had such a license, if it is a fact, would not alone make this defendant corporation liable for the actions and statements of Sang in his dealing with plaintiff.

"I think I have covered the second of the supplemental requests in the general charge, to a great extent.

"I give three, not in the language that it was drawn but modified and changed as the condition now of the case in the opinion of the court requires.

"It is claimed by the plaintiff as a part of the fraud in this case that at the time of the purchase of this stock, the company's capital was impaired to the extent of $351,000.    This does not mean necessarily that the company's losses had reduced its capital stock $351,000.    Without going into figures I think it fairly appears from the testimony that by reason of agency balances, more than 90 days old, stockholders' notes and other matters, called 'non-ledger assets,' the department of insurance upon examination after eliminating a number of these not admitted assets, showed this impairment, but from all the facts and circumstances, it is for you to say whether or not the officers of the company were justified in issuing the

statement in relation to the company that Sang had with him at the time he sold the stock.

"As to that part, I think I have already covered it in relation to the evidence about the future of the company, I had already taken that into consideration with the jury.

"Now, gentlemen, in this case you will carefully consider all the evidence and the charge I have given, and in conclusion I say to you this:  I charge you that in a case of claimed fraud, there are two remedies that the party defrauded may take advantage of.  He may affirm the contract, keep what he had received thereunder, and bring suit for such damages as he has sustained by reason of the fraud; or he may do as was done in this case, rescind the contract, tender back what he has received because thereof, and demand a return of his money paid therefor, and in case of its non-return bring suit to recover the money; and in the event he is entitled to recover he may recover the price paid as well as interest thereon.  In this case, he would be entitled to recover the price paid and interest from the 20th day of December, 1921, the amount being $9,472.50.  If you find for the plaintiff, you will find for him in that amount, and if he is not entitled to receive that, then your verdict will be no cause of action."

We should now consider some of the facts: Prior to 1921 Mr. Curwood became a stockholder in defendant company and was a stockholder when he received by mail the following:

"October 31, 1921.

"*Dear Stockholder:* Today our company stands on the threshold of a phenomenal future, and once the general public is aware of what is transpiring on the inside, a substantial increase in the value of our stock is certain to occur.

"Recognizing the fact that the early stockholders of the Peninsular Fire Insurance Company are entitled to their full share of our success, a representative of our financial department will call on you and fully explain in detail, and give you such other information as we know will be of interest to you.

"We have recently moved into our new home office

building, a three-story building, and is owned exclusively by the company. Our company occupies the first story for its business purposes and has several tenants including the Peninsular Casualty Insurance Company, which occupies part of the second story for its home office, and we are gradually acquiring desirable tenants for the remaining office space at favorable rentals.

"An explanation of the company's progress to our stockholders was insisted upon through a feeling of obligation and appreciation which will always be fully recognized.

"Trusting that you will co-operate to the fullest extent of your ability with our representative when he calls, and assuring you of our earnest appreciation for whatever courtesies extended him, we beg to remain,
"Yours very truly,
"THE PENINSULAR FIRE INSURANCE COMPANY,
"COLON C. LILLIE, President."
P. J. J.-C. C. L.

In December the following on the letter head of the Peninsular Fire Insurance Company of America was sent:

"December 3, 1921.
"MICHIGAN SECURITIES COMMISSION,
    "Lansing, Michigan.
"*Gentlemen:* Enclosed find our check for $3.00. Please send us stock selling license for M. Sang and very greatly oblige.
"Very truly yours,
"COLON C. LILLIE, President,
"Peninsular Fire Insurance Company of America."

On the 6th of December the license was sent as requested, and was in the possession of Mr. Sang when he interviewed Mr. Curwood.

We now quote some of the testimony of Mr. Curwood:

"I first became interested financially in the Peninsular Fire Insurance Company of America on or a little preceding the 8th day of December, 1919. * * * After receiving these exhibits I met a man by the name of Sang on December 1, 1921. * * *

"*Q.* What did he say?   *   *   *

"*A.* He said that because of the fact that I was one of the first and original investors in the Peninsular Fire Insurance Company, the company had allotted me 150 shares of the original stock which had been forfeited by others, who had agreed to take the stock and who had not paid for it, and then he went on to tell me how much the stock was worth.   He said I couldn't have more than this 150 shares of stock, and he said that the stock was now worth $100 a share although in spite of that fact the company was selling these few shares of stock for $50 a share.   That explanation came to me because I asked why he was selling it at $50 a share when I only paid $60 a share for the original stock.   In explanation of this he said the stock was now worth $100 a share, and he drew from his pocket, or he had already drawn from his pocket, because when he entered my room he handed me a letter which introduced him."   *   *   *

The letter was on the letter head of the defendant company.   It read:

"Grand Rapids, Mich., Oct. 29, 1921.
"To the stockholders of the Peninsular Fire Insurance Company of America:

"The bearer, whose signature appears below is an accredited representative of the Peninsular Fire Insurance Company of America, and is authorized to transact all business pertaining to the additional shares that have been allotted to you, and to receive payments for the sale of the capital stock.

"Make all checks Payable to the Peninsular Fire Insurance Company of America.

"Yours very truly,
"PENINSULAR FIRE INSURANCE COMPANY
OF AMERICA.
"By COLON C. LILLIE, President.
"M. SANG.
"Signature of Representative."

"*A.* I told Mr. Sang that I was very busy this morning, I wanted to hurry the matter, and I desired him to show me the facts in the case immediately, and Mr. Sang took from this wallet of papers two cards and a paper which was not a card   *   *   *   but he

pointed out to the effect the company had $76,000 to the good.   *   *   *   Mr. Sang told me that the company had made 43 per cent. profit during the past year and that it was to pay a 20 per cent. dividend in January, and that the stock which he was offering to sell me would participate in that dividend.

"Q. What if anything did he say to you about there being only a limited amount of stock?

"A. I said a moment ago he said, no amount of money would buy more than my 150 shares because that was all that would be allotted to me.

"Q. What did he say as soon as it became known about this dividend would be declared, would happen to the market value of this stock?

"A. I don't know as he mentioned dividend.   He said the stock, what there was of it for sale, the stock was worth a hundred dollars a share on the market.   *   *   *

"I believed the representations made to me by Mr. Sang at this time.   I believed the representations which were made to me in the circular letters which had been received.   On the strength of these representations I informed Mr. Sang that I would take the 150 shares allowed to me on the terms offered and pay cash for it.   I was in a hurry that morning and I telephoned the Citizens Saving Bank to have a draft made out for me for $9,000 so I would lose no time when I got there making it.   We immediately put on our coats and left my studio and when we came to the stairway in the second floor Mr. Sang stopped and said, 'Wait just a minute.'   He said he had a little slip, an application blank that he wanted me to sign. Previous to this Mr. Sang had already written the receipt of this $9,000 and with our coats and hats on we turned back to my room.   I stood up to my desk, he put a little slip on the desk and I tacked my name to it.   At that time I had not read over the slip. I know it was the Peninsular Fire Insurance Company's slip and I saw on one corner a few words, something to the effect that stock purchased on this application would receive dividends as if purchased previously, corroborating what Mr. Sang had already told me.   I never heard the name of L. M. Bach & Company in any of the talk I had with Mr. Sang.   The first intimation I had there was such a concern in the

world was when Mr. Lillie wrote me in answer to my letter. Exhibit 32 is the receipt Mr. Sang had written out. That was written in my studio after we put on our coats. That receipt was not delivered to me at that time. He kept it because I had urged upon him the necessity of haste. I was in a hurry on that particular morning.

"When we got to the bank Mr. Sang remained in the automobile outside and I went inside; they delivered to me Exhibit 19 and I paid $9,000 for it. I wrote on the back of the draft, 'Pay to the order of the Peninsular Fire Insurance Company' and indorsed it in my own name, 'James Oliver Curwood' and went out to the machine and gave it to Mr. Sang and then he gave me the receipt,—

"'Owosso, Michigan, Dec. 1, 1921.

" 'Received of James Oliver Curwood, of Owosso, Michigan, the sum of nine thousand dollars.

" 'THE PENINSULAR FIRE INSURANCE COMPANY OF AMERICA,
by N. H. SANG, Representative.' "

Mr. Nichols cross-examined Mr. Curwood, and Exhibit P was read in evidence:

"All stock purchased either complete or partial payment will participate in all stock and cash dividends hereafter declared.

"The right is reserved to decline all or any part of this subscription and to advance the price per share without further notice, in which event the money paid will be returned provided check is made payable to the Peninsular Fire Insurance Company of America.

"Application for stock. The Peninsular Fire Insurance Company of America. Home office, Grand Rapids. Shares twenty-five dollars, par value each.

"L. M. BACH & COMPANY: You are hereby authorized to procure for me one hundred and fifty fully paid and non-assessable shares of the capital stock of the Peninsular Fire Insurance Company of America, a corporation incorporated under the insurance laws of the State of Michigan, for which I agree to pay therefor $60 per share as follows: $9,000 in cash on each share with this subscription, and the balance as follows—in full. As soon as the said payments have been completed in cash, a stock certificate is to be

issued to me by the company showing that said stock is fully paid up and non-assessable.    It is understood that the first payment hereon shall be liquidated damages should I fail to complete the subscription as agreed in accordance with a promissory collateral note given hereunder.

"That I may be represented at all meetings of the stockholders of the Peninsular Fire Insurance Company of America, I hereby appoint and constitute Colon C. Lillie my true and lawful attorney in fact, to represent me at any and all meetings of the stockholders of said company at which I may not be personally present, thereby granting him full power and authority to act for me and in my name and stead vote the stock of said company standing in my name on the books thereof, until this proxy shall be revoked in writing by me.

"This authority contains all the terms of my contract and no material representation has been made to me other than those contained herein.

"Witness my hand and seal Dec. 1, 1921.

"Name, JAMES OLIVER CURWOOD.

Address, 508 W. Williams St.

"Occupation, Author.

"N. H. Sang, witness.

"After I had got on my overcoat prepared to leave the room for the bank, but preceding the telephone to the bank, Mr. Sang stated to me that he wanted me to sign a subscriber's blank.    It was this blank, Exhibit P.    I didn't see L. M. Bach & Company in large black face type, larger than the other.    The Peninsular Fire Insurance Company was so much larger that is all I looked at.    I couldn't help but see it. My attention wasn't particularly attracted to the words The Peninsular Fire Insurance Company of America. The business was over with when I signed it.    I stood up to sign it.    I came back in the room, had my coat and hat on, and stood up to sign this paper.    I suppose I noticed how many shares of stock he inserted in this subscription blank that I was purchasing.    I didn't pay particular attention.    I was paying my draft.    I knew I had security.    I simply signed the paper hurriedly.    It may have been very foolish for me to have done it, but it happened.    I absolutely

didn't know I had requested and authorized L. M. Bach & Company to buy 150 shares of the Peninsular Fire Insurance Company's stock for me.   I never heard of L. M. Bach & Company until I got Mr. Lillie's letter."

Soon after Mr. Curwood delivered his check or draft to Mr. Sang he received from the defendant a certificate for 150 shares of its stock duly signed by the officers of the company, with the seal of the company attached.   Upon the trial it appeared that at the time this certificate was issued there was canceled stock of Mr. Lillie and his son-in-law, 63 shares of stock and 87 shares were defaulted stock.   This fact, however, was not known to Mr. Curwood until the trial.   Mr. Curwood soon learned that the statements made to him were not true, and sent an attorney with the stock to the defendant.   The attorney interviewed Mr. Lillie and tendered the stock and demanded the $9,000 paid for it.   The tender was refused as was the demand for the $9,000.   Suit was soon after instituted with the result before stated.

We quote section 1 of article 8 of the by-laws:

"The President.   The president shall be the chief executive officer of the company and see that all income and disbursements are properly recorded in the company's books kept for that purpose, which shall be known as the company's controlling account ledger. He shall sign all checks, vouchers and other forms of disbursements."

"Article 15, Section 1.   Certificates of stock.   All certificates of stock shall be signed by the president and secretary and attested by the seal of the company."

"Article 17.   General Counsel.   Section 1.   The general counsel shall be appointed and employed by the board of directors and shall be the company advisor in all matters of legal nature and shall be paid compensation for services to be determined by the board of directors."

In October, 1921, the counsel of the company drew

a contract between the defendant company and L. M. Bach Company of Chicago.    As to this contract Mr. Bach testified:

"*Q.* Did you ever intend when you made this contract to carry it out according to its terms?
"*A.* No, sir.
"*Q.* And neither you or McGinnis intended to do that, did you?
"*A.* No, sir.
"*Q.* You and McGinnis had an entirely independent and collateral agreement and understanding as to what you would do that was separate and apart and different from this contract, didn't you?
"*A.* That is right, sir."

We have not quoted this contract because Mr. Curwood never saw it and never heard of it until after he had made his purchase.

Defendant made 33 written requests.    These were not given except as has already appeared.    Counsel take up these requests and discuss them at considerable length.    We think we may well content ourselves by saying that so far as they were proper they were fully covered by the general charge.

Counsel on both sides have filed long and elaborate briefs.    The defendant insisting there should have been a directed verdict for the defendant

(1) Because of the written application signed by him.
(2) Because of the individual character of the fraud perpetrated upon him.
(3) Because of his election to rescind the contract and recover the full purchase price.

We have already called attention to Mr. Curwood's statement as to the signing of the application, and we think the trial judge correctly instructed the jury as to that feature of the case.

The second proposition is based upon the claim that the stock sold was the individual stock of Lillie and his son-in-law, and that the president was not author-

ized to sell stock of the company, and that Sang was the agent of L. M. Bach & Company.    We think this claim was also safeguarded by the trial judge to the jury.

As to the last of these contentions the trial judge properly said to the jury what course plaintiff might take.

In considering this case it should not be forgotten that Mr. Lillie was not only the president of the company but was also its chief executive and manager; that he was authorized to indorse checks and drafts and did indorse the draft of Mr. Curwood.    We quote from the syllabus of *Ceeder* v. *Lumber Co.,* 86 Mich. 541 (24 Am. St. Rep. 134) :

"The fact that a person having the general direction and active control of the business of a corporation is also its president does not operate as a limitation of the powers usually exercised by such agents or managers; nor is his authority limited to that possessed by virtue of his office, but it is incident to the management of the business.    *Adams Mining Co.* v. *Senter,* 26 Mich. 73, 76; *Eureka Iron & Steel Works* v. *Bresnahan,* 60 Mich. 332; *Whitaker* v. *Kilroy,* 70 Mich. 635."

The cases of *Allen* v. *Railroad Co.* and *Craft* v. *Railroad Co.,* 150 Mass. 200 (22 N. E. 917, 5 L. R. A. 716, 15 Am. St. Rep. 185), are very instructive reading in this connection.    Among other things said is the following:

"The present cases, we think, fall within the principle, that, where one of two innocent persons must suffer a loss from the fraud of a third, the loss must be borne by him whose negligence enabled the third person to commit the fraud."

We think it well to quote from *Samuels* v. *Detroit Trust Co.,* 223 Mich. 661, as follows:

"Reeber's creditors and his administrator representing them are innocent third parties to this transaction. By giving this warranty deed Samuels represented

226—Mich.—38.

and put it in Reeber's power to represent to his creditors that he was absolute owner of this property. Conceding that he did so innocently and only as security for aid Reeber was to give him, it is a general rule of not remote application to this situation that 'where one of two innocent parties must suffer by the wrong of a third, it should be that one which has put it in the power of the third to work the injury.' *Miller* v. *Insurance Co.*, 101 Mich. 49 (45 Am. St. Rep. 389)."

The case was carefully tried and we find no reversible error in it.

The judgment is affirmed, with costs to the appellee.

CLARK, C. J., and McDONALD, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.