# The Adams Mining Company v. John Senter.

*Mining companies: Power to buy timber: General agent.* There is no lack of power in a mining company to buy timber, and a purchase of it by a general agent is within his powers; and a sale of it, made by him, will be upheld.

*Agency: Mining superintendent.* The authority of mining superintendents, or general agents in charge of mines, will be recognized without proof, as covering all the ordinary local business of the concern; and persons dealing with them have a right, in the absence of notice to the contrary, to assume they have such power.

*One person acting as agent for two companies.* When the same person is made agent of two mines in the same vicinity, and it becomes necessary for one to

deal with the other, he must be presumed to. have the same power to act for both that would be possessed if there were two agents acting separately, and may dispose of property in the same way. And such a double authority would dispense with such formalities as could not be complied with where one man acts for both companies.

*Transfer of property from one company to another, when the same person is agent for both.* Where one of such companies authorizes its supplies to be used for the benefit of the other, a third person may rely on the authority of such joint agent in transferring any property belonging to either, as sufficient to pass title, and no formal transfer from one company to the other would be necessary to protect a purchaser dealing with either. The agent will be treated as competent to bind both.

*Authority of such agent.* Where an agent is empowered to use the supplies of one company for another, he may use them as well in exchange for articles necessary to be purchased, as *in specie.* And where timber owned by one company was used to obtain powder for the other, which could only be done by settling also an outstanding powder account, it was held within his discretion.

*Sale of timber: Delivery: Measurement: Title.* Where an amount of timber was identified and sold at a given price per foot, and put under the control, and subject to the direction, of the purchaser, it was held the sale was complete; the measurement not being necessary in such case to pass title, and none but a constructive delivery being possible.

*Sale: Subsequent notice.* Such a sale could not be revoked by any subsequent notice.

*Heard October 23. Decided October 29.*

Error to Houghton Circuit.

*Ball & Chandler* and *A. Russell,* for plaintiff in error.

*Hubbell & Chadbourne, J. G. Sutherland* and *G. V. N. Lothrop,* for defendant in error.

CAMPBELL, J.

Plaintiffs sued defendant for taking timber alleged to be their property. He claimed title as having purchased it from William Frue, the agent of the plaintiffs, and also of the South Pewabic Company, to apply in payment upon a bill of mining powder and fuse, which was due him from the latter company.

There is no dispute about the important facts in the case, which were in substance, so far as essential to the exceptions alleged in the cause, as follows:

Both companies were organized mining companies at

Portage Lake, in the Upper Peninsula, mainly owned by the same parties in interest, and employing the same general agent, Captain Frue.   In the spring of 1870, and for some months previous, work had been suspended on the Adams mine, to await developments on the same lode in the South Pewabic.   The supplies of both companies were kept together, and Frue was authorized to use the Adams supplies for the other company in his discretion, debiting them, when wanted, to the South Pewabic.   The Adams Company had on hand the timber in question—about twenty-six thousand feet—a year or more before the transactions in controversy, and Frue had been directed in 1868 to dispose of it if he could.   There was some dispute as to the precise character of his instructions at that time. The timber was not wanted for any purpose of the Adams mine.   In the spring of 1870, the South Pewabic was short of powder and fuse, and had run up an unpaid bill with Senter of about five thousand dollars, and, unless it was arranged, he was unwilling to furnish any more.   Frue proposed to him, and it was finally agreed, that he should take this lumber at seventeen cents a foot.   The bargain was closed, and a new account was afterwards opened for the desired articles, which was not paid up before the company failed, or stopped operations, and is still unpaid.

Frue put the timber in charge of one Ames to take charge of it for the South Pewabic Company.   The timber was in rafts, and moored at the premises of the South Pewabic.   He afterwards was directed to take charge of it for Mr. Senter, and was employed by mutual consent to measure it.   He removed it for defendant to the other side of the lake, Mr. Ball, claiming to act for plaintiffs, objecting, and claiming it to be their property.

The jury found for the defendant.

The questions presented can be best disposed of by

combining such of them as are not distinct. Much of the controversy turns on the powers of Captain Frue, the mining agent. Both companies had their principal offices in Boston, and Elisha T. Loring of Boston was president of both, and Charles H. Palmer of Pontiac, the only Michigan director in either company.

It was claimed that these corporations had no power to buy or deal in timber, and that, for this reason there could be no agency in Frue to do what could not be done by his principals. But this is not to be supposed. It appears this timber was originally designed for use by the Adams Company, and whether it had been so designed or not, we are bound to know that in mining operations, as well as in the auxiliary work connected with them, timber is indispensable for some purposes, and capable of use for many. It would require a very plain case to justify a court in holding, as a legal proposition, that any such corporation might not become lawfully possessed of such property, and we cannot, in advance, and without some manifest necessity, assume that such cases are to be found.

The next question refers to the extent of Frue's authority, independent of specific and expressly granted powers. We are not satisfied that any testimony would be needed to show the extent of the ordinary powers of an agent in charge of such a mine. The authority of such officers must, within the usual range of business, at least, be recognized judicially, like that of bank cashiers, vessel captains, and other known agents. The mining law recognizes agents by name, as known representatives on whom process may be served. They are the persons who have charge, personally, of the local business at the mines, and are necessarily to be treated in law as general agents, to do all that is fairly within the scope of corporate business in conducting the operations in that locality. The testimony of Mr.

Palmer, which shows the usual range of such agencies, indicates no more than should be inferred. . The business could not be conducted at all without a very wide discretionary power.    There is no reason, and can be no legal principle, which will put the agent of a corporation on any different footing than the agent of an individual, in regard to the same business.    A general agent needs no instructions within the range of his duties, and any limitations on his usual powers would not bind others dealing with him and not warned of the restrictions.

So far as any instructions from the corporation authorities are concerned, they would, as between the agent and his principals, govern his liability.    There is no legal presumption as to the powers of the president of a mining company; but as Mr. Loring's acts have been assumed in this case to be authorized, they must be so considered in this court, and it is probable they were so in fact authorized, so far as they were material.

The question next arises, how far the double agency of Captain Frue affected his relations to his employers and to third persons.    It was claimed that upon the principle that a man cannot contract with himself, and cannot occupy positions involving a conflict of duties, all of his dealings whereby the property of one company was transferred to, or used for, the other, should be held unlawful. There is no validity in such a proposition.    The authority of agents may, where no law is violated, be as large as their employers choose to make it.    There are multitudes of cases where the same person acts under power from different principals in their mutual transactions.    Every partnership involves such double relations.    Every survey of boundaries, by a surveyor jointly agreed upon, would come within similar difficulties.    It is only where the agent has personal interests conflicting with those of his principal,

that the law requires peculiar safeguards against his acts.
There can be no presumption that the agent of two parties
will deal unfairly with either.   And when they both delib-
erately put him in charge of their separate concerns, and
there is any likelihood that he may have to deal with the
rights of both in the same transactions, instead of lessening
his powers, it may become necessary to enlarge them far
enough to dispense with such formalities as one man would
use with another, but which could not be possible for a
single person to go through with alone.

When these two mining companies appointed Frue to
act as their agent in charge of their respective mines, it is
not supposable that either expected him to have less
authority than if two agents had been chosen, one for each.
And it would follow, of necessity, that under such an
appointment, if any case should arise in which the agent
of one mine would have legitimate occasion to deal with
the agent of another mine, within the usual range of
agency business, the one agent occupying the place of two
such agents, must have the same power to dispose of such
matters, or else the mine must suffer.   The common-sense
inference from such a double appointment would rather be,
that if there should be any difference, it should be towards a
more intimate relationship in business than where the agen-
cies were separate.   And in the present case the evidence
shows such an intent, going beyond what would probably
be usual in most cases.

One inevitable result must be, that by all persons not
actually notified to the contrary, his disposal of any property
in his hands, in such manner as mining agents usually act,
will, and should be, assumed as lawful.   Each company
having given him power to act over its concerns, it will be
impossible, by reason of that holding out, for any one to
know on whose behalf he deals, or whether he has a right

to deal, except from his own representations. The employers who put him in such a position must be estopped from questioning the acts they have so plainly authorized and enabled him to do.

In the present case, the timber was subject to sale by the agent of any company that owned it.    The Adams Mining Company had distinctly authorized their supplies to be used for the purposes of the South Pewabic. It was not necessary, in order to carry out such a purpose, that the title should first pass from one company to the other, in any formal way, or at all.    The act of an agent representing them both, would be as effectual as their joint transfer to any third person purchasing.    As between themselves, the only possible adjustment must be by a transfer of credits on account, or a deposit, or shifting of funds to the private account of the proper company.

If Captain Frue, in the exercise of his judgment, determined that it was necessary to adjust or secure an outstanding powder account, as the best means for obtaining further necessary supplies, we think it was within his agency to do it.    And if he was authorized to use the supplies of the Adams Company for the South Pewabic, we see no reason for holding that such an appropriation would be less legitimate than if the timber had originally belonged to the latter company.    It was a reasonable and fair use of discretion in the choice of means to reach what was essential to the mining business.    If Mr. Senter had been informed of the whole facts, he would have been justified in relying on Frue's authority.

After the contract was made, Frue did all that was possible to effect a delivery.  Such delivery must necessarily be constructive, and the agent in charge of the timber, having been instructed, and having undertaken, by the joint directions of Frue and Senter, to hold it for the latter, the deliv-

ery was complete. The whole property being identified and sold, at a fixed price per foot, the process of ascertaining the amount was not essential to passing the title, as it might have been if less than the whole amount delivered was to be sold and separated by measurment. In that case, the measurement might be necessary to fix the identity of the property sold. But where all is sold, no such process is needed to pass title. The ascertainment of the price was a mere mathematical computation, involving no further action to bring the minds of the parties together.

Assuming that Mr. Ball, who acted on behalf of the plaintiff, had authority to overrule the action of Captain Frue, and that his notice was given to Senter himself, it was too late to affect his rights, when the sale was complete already.

These considerations dispose of all the errors assigned, and it will not be necessary to refer to them specifically. The judgment was correctly given, and must be affirmed, with costs.

The other Justices concurred.