## TATSUNO v. KASAI.

No. 4485.   Decided August 29, 1927.   (259 P. 318.)

204

*Claude T. Barnes* and *E. A. Walton,* both of Salt Lake City, for appellant.

*Badger, Rich & Rich,* of Salt Lake City, for respondent.

STRAUP, J.

The case is one in equity involving stock transactions between the plaintiff, Tatsuno, and the defendant, Kasai. The case was tried to the court. It found that between January 1, 1918, and June 22, 1923, the plaintiff purchased 1,300 shares of the capital stock of the Tintic Standard Mining Company, which purchases, with plaintiff's money, were made and effected by the defendant for and on behalf of the plaintiff; that the plaintiff and the defendant were personal friends; and that the defendant, who was well educated and experienced and the plaintiff not, counseled and advised the plaintiff with respect to such stocks; that the stocks were placed in the possession of the defendant as a trustee and a fiduciary to hold and retain them for plaintiff's use and benefit and to sell them on his demand, or redeliver them or the proceeds thereof, if sold, at plaintiff's request; and that the defendant with respect to such matters undertook as a fiduciary and trustee for the plaintiff to act for and advise the plaintiff and handle such stocks for the best interest of the plaintiff; that prior to April 28, 1924, the plaintiff requested the defendant to sell 500 shares of the stock at the market price, however, not less than $4 per share, and on April 28, the defendant (residing at Salt Lake City and the plaintiff then at Los Angeles) wrote the plaintiff that he had sold 500 shares at $4 per share, and remitted to the plaintiff $1,-969.60, the price at which the stock was reported by the defendant to have been sold, less $30 commission and a tax of 40 cents; that the defendant in fact made no sale of such stock, but to benefit and enrich himself took the stock as his own without the knowledge or consent of the plaintiff and without disclosing the fact that the defendant had merely taken it for his own use and benefit; that the market price of the stock then was $4.07½ a share; and that the defendant had not paid or in any particular obligated himself to pay any commission, but made such deductions to deceive the

plaintiff and to keep him in ignorance that the defendant had merely appropriated the stock to his own use and benefit; that in November, 1924, the defendant visited the plaintiff at Los Angeles and then counseled and advised the plaintiff to sell and dispose of the whole of the remaining 800 shares of the stock and to invest the proceeds in Japanese or English bonds; that the plaintiff, relying upon the counsel and advice of the defendant and because thereof, in December, 1924, requested the defendant to sell 400 shares more of the stock at about $7 per share, the exact amount at which the stock was to be sold being left to the judgment of the defendant, and directed that if the stock appeared rapidly to decline in value to sell the remaining 400 shares; that on December 23, 1924, the defendant again wrote the plaintiff that he had sold 400 shares of such stock at $7.50 a share, and that he had on hand $2,955, the proceeds of such sale less $45 commission; that the defendant again made no sale whatever of such stock, but fraudulently and falsely took the stock unto himself as of December 23, 1924, at $7.50 a share, when the market value thereof was $9.05 a share, and paid out no money whatever by way of commission nor in any particular had obligated himself to do so; that prior to January 10, 1925, the plaintiff requested the defendant to sell the remaining 400 shares according to defendant's judgment and discretion, and on January 12, the defendant wrote the plaintiff that he had sold such shares at $8.75 a share and that he had on hand $3,447.42, the proceeds of sale less $52.58 commission, but defendant again had made no sale whatever of such stock, and when he wrote the plaintiff that he had sold the stock at $8.75 the market value then was $9 a share, and that the defendant again merely took such stock for his own use and benefit, without informing the plaintiff of such fact; that the defendant was not at any time a licensed stock broker but kept well informed of the market price and value of the stock on the Salt Lake Stock Exchange, where such stocks were listed, and at all times had first hand and accurate information from officials of the

company as to the conditions of the mine and otherwise from personal observations and investigations; that on January 12, 1925, the defendant wrote and represented to the plaintiff that shares of the capital stock of the Eureka Standard Mining Company were desirable purchases and that he had himself purchased 1,000 shares thereof, that the stock was selling at from 95 cents to $1 per share, and, relying upon such representations and because thereof, the plaintiff requested the defendant to purchase 1,000 shares for him; that on February 7, 1925, the defendant wrote the plaintiff that he had purchased 1,000 shares of such stock for the plaintiff, at $1 a share and that such purchase price, including commission amounted to $1,016.08; that the defendant in fact had purchased no such shares for the plaintiff, but merely sold his own 1,000 shares to him at $1 a share, when the market value thereof was only 75 cents a share, and which shares the defendant had theretofore purchased at about 50 cents a share.

The court further found that on February 7, 1925, the same day the defendant informed the plaintiff he had purchased 1,000 shares of Eureka Standard stock for plaintiff's use and benefit, he remitted to the plaintiff $3,086.20 as representing the proceeds of the sales of 800 shares of the Tintic Standard stock less $1,600 which the defendant had retained and deducted as his share of the profits in the transaction, and less $1,016.08, the purported purchase price of the 1,000 shares of the Eureka Standard stock, and less $100 which the defendant claimed he had applied on a church subscription for plaintiff's use, which was unauthorized by the plaintiff. The court further found that the defendant had received dividends on the 1,300 shares of Tintic Standard stock intrusted to him amounting to $1,540, for which he had failed to account to plaintiff.

In the answer and in the counterclaim of defendant it was alleged by him that in January, 1918, the plaintiff, because of the defendant's knowledge and experience, employed

the defendant as plaintiff's financial adviser and agent with respect to the purchase and handling of the Tintic Standard stock; that for the defendant's services in such respect the plaintiff agreed to give the defendant one-half of the profits to be made from such or any investment made by plaintiff; that in pursuance thereof the defendant frequently advised and counseled with the plaintiff with respect thereto; that from the proceeds of sales the defendant had remitted to the plaintiff $5,755.86 with the understanding that such money would be available for reinvestment under their arrangement and that at a suitable time plaintiff and defendant would have an adjustment of their affairs and that the defendant should receive on-half of the profits, but that the plaintiff had repudiated such contract or arrangement with the defendant and refused to account to him for dividends which the plaintiff himself had received upon such stock, or to allow the defendant any of the profits resulting from the purchase by plaintiff of the Tintic Standard stocks. The defendant further alleged that between January, 1918, and February, 1925, he at the instance and request of the plaintiff had rendered and performed services for the plaintiff as a business and financial adviser and agent in connection with the plaintiff's affairs, and particularly in the purchase and sale of the Tintic Standard stocks, and that the defendant's services in such respect were of the reasonable value of $3,387.71, which the plaintiff had promised and agreed to pay; that the plaintiff refused to so compensate defendant for his services; and that the defendant applied on account of such services $1,600 from the proceeds of the sale of plaintiff's stock and held the 1,000 shares of Eureka Standard stock pending a settlement of his claim with the plaintiff. The court found that such allegations were not supported by the evidence and were without merit, and found them against the defendant, except the averments that the defendant was the agent and financial adviser of the plaintiff. The court further found that the plaintiff relied upon the counsel and advice of the

defendant as his agent and trustee with respect to the purchase of the stock and the handling of it by the defendant and relied upon the representations made as to the purported sales of the stock, and had no knowledge to the contrary, and especially that no sales had been made of the stock and that the defendant in fact had merely appropriated the stocks to his own use and benefit, until after the commencement of the action and when the defendant's deposition was taken on July 3, 1925, at which time the plaintiff repudiated the purported sales and all transactions with respect thereto and demanded a return of the stock; and that the market value of the stock at that time was $11 a share.

As conclusions of law the court stated that the purported sales of the Tintic Standard stock and the purported purchase of the Eureka Standard stock and the transactions with respect thereto were fraudulent and voidable, and that the plaintiff was entitled to repudiate such transactions as he had done and to the possession of the Tintic Standard stock, or to recover the market value thereof as of July 3, 1925, the day of the repudiation, which, at $11 a share for the 1,300 shares of the Tintic Standard stock, less a commission of $143, amounted to $14,157 and interest thereon, all the dividends which the defendant had received on such stock, with interest thereon, amounting to $1,665.08; that the defendant was entitled to a credit of $5,705.76 which he had remitted to the plaintiff, and interest thereon; and that after deducting such credit the plaintiff was entitled to a judgment against the defendant for $10,567.26, with interest at 8 per cent per annum until paid. Judgment was entered accordingly, from which the defendant appeals.

While the findings by assignments are challenged as not being supported by the evidence or as being against the greater weight of the evidence, yet little is said concerning such matters and not anything of substance pointed out and our attention called thereto which requires contrary find-

ings or a modification of the findings as made by the court. The findings thus are and on a review of the record ought to be approved by us.

The chief contention of the appellant is that on the findings and on the record the defendant was a mere agent of the plaintiff to sell plaintiff's stock, at his request and as directed by him, and that the defendant in such manner and not otherwise sold and disposed of the stock, and, though he sold it to himself, such was not anything forbidden by or inconsistent with any contractual relation of the parties, and rendered the defendant liable, if at all, only for the difference between the market price of the stock and the price at which he sold it to himself. Upon such theory cases and authorities are cited, chiefly: 3 Sutherland on Damages, §§ 777, 778, 780; *Hutton* v. *Sherrard*, 183 Mich. 356, 50 N. W. 135, L. R. A. 1915E, 956; *Greenfield Sav. Bank* v. *Simons*, 133 Mass. 415; *Oliver* v. *Lansing*, 48 Neb. 338, 67 N. W. 195; and *Collins* v. *McClurg*, 1 Colo. App. 348, 29 P. 299. Such cases in effect hold that if an agent did what he was authorized to do but merely violated some instruction, such as in regard to the terms of sale or manner of disposing of the proceeds, such violation, while not a conversion, still entitled the principal to the price which would have been received had the agent followed the instructions. Such general rule may be conceded. The case, however, is not so easily disposed of. No doubt the plaintiff could have proceeded upon such theory. However, the course pursued by him and to which the findings and conclusions are responsive involves the doctrine as stated in 21 R. C. L. p. 825, under the title "Principal and Agent," § 10, that:

"The employee is duty bound not to act in antagonism or opposition to the interests of the employer. Everyone—whether designated agent, trustee, servant, or what not—who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose must be loyal and faithful to the interest of such other in respect to such business

or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his services. He may not speculate for his gain in the subject-matter of the employment. He may not use information that he may have acquired by reason of his employment either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interests. He will be required to account to his employer or principal for any gift, gratuity, or benefit received by him in violation of his duty, or any interest acquired adverse to his principal without a full disclosure, though it does not appear that the principal has suffered any actual loss by fraud or otherwise."

And authorities need not be cited to the proposition that an agent must act honestly with his principal and must not, except with his principal's knowledge and consent, enter into any transaction concerning the subject-matter of the agency in which he has interests adverse to those of his principal.

In *Burt & Carlquist Co.* v. *Marks et al.*, 53 Utah 77, 177 P. 224, this court approvingly quoted the doctrine as stated · in 2 Pomeroy, Eq. Jur. § 959, to the effect that equity regards and treats the relation of principal and agent in the same general manner and with nearly the ■ same strictness as that of trustee and fiduciary, and that the underlying thought is that an agent should not unite his personal and his representative characters in the same transaction, and that "in dealings without the intervention of his principal, if an agent, for the purpose of selling property of the principal, purchases it himself, or an agent, for the purpose of buying property for the principal, buys it for himself, either directly or through the instrumentality of a third person, the sale or purchase is voidable," and that "any unfairness, any underhanded dealing, any use of knowledge not communicated to the principal, any lack of the perfect good faith which equity requires, renders the transaction voidable."

What was said in *Greer* v. *Craig,* 165 Ark. 209, 263 S. W. 400, may here be said:

"There was here a relation of trust and confidence. There was an admitted agency, and a commission as such was charged and paid. The agent had no right to make a profit at his principal's expense. Good faith required him to sell the land for her at the best price obtainable and this he did not do. He cannot, therefore, be allowed to retain the profit which he made out of the transaction; nor can he be allowed to retain the commission. As he became in effect a purchaser from his principal without disclosing that fact, he must assume that attitude in accounting to her, and must restore the commission which he improperly charged. * * * Appellee would, in fact, have been entitled to a rescission of the sale so far as appellant is concerned had she elected to do so within a reasonable time after the discovery of the facts. This she did not do, nor has she done so yet. This relief was not prayed in her complaint, but we think she had the right to elect, as she has done, to affirm the sale and require her agent to account to her for the actual purchase price."

The authorities are to the effect that when an agent, in violation of his duty and of the confidence imposed in him to sell property of his principal, to the injury and detriment of the principal, sells the property to himself or takes it without disclosing such fact to the principal, the principal upon discovery of the fact has the election to accept the situation, ratify the sale and seek to recover his damages, or he may repudiate the transaction and seek to be placed in statu quo by demanding a return of the property or of its value at the time of the repudiation if timely made. It is the former remedy which the defendant in effect asserts the plaintiff was required to pursue, and it is the latter which plaintiff claimed the right to pursue and did pursue. The election, of course, was with the plaintiff and not with the defendant.

That there was here a fiduciary relation, one not only as generally exists between a mere principal and agent, but that of a trustee and cestui que trust, is clearly shown on the record. The defendant, prior to plaintiff's purchase of the Tintic Standard stock, rep-

resented and acted for the plaintiff in other business matters and transactions, and as a financial agent and friend counseled and advised him with respect thereto. The defendant was capable and experienced in business affairs and in handling and dealing in mining stocks. The plaintiff was not. With respect to such matters the plaintiff imposed the utmost confidence and trust in the defendant. The defendant was familiar with the operations of the Tintic Standard mine, claimed to have and did have inside information concerning such operations and of the conditions of the mine and the market value of the stock, and so expressed himself to the plaintiff. The plaintiff was inexperienced in and unfamiliar with such matters. The defendant as adviser in this as in other matters advised him to purchase Tintic Standard stock. The plaintiff purchased it upon the defendant's advice and with the understanding that the defendant would handle it to the best interest of plaintiff. The defendant, in effect, so testified himself, and with such understanding the plaintiff intrusted the stock to the defendant to be so handled and disposed of. Shortly after that the plaintiff moved to Los Angeles, where he thereafter resided. The defendant continued to reside in Salt Lake City. In case of mere principal and agent it generally is the judgment and will of the former which control the handling and disposition of properties, and the duty of the latter to yield obedience thereto. But here the defendant was not only the mere agent of the plaintiff but also was his counselor and adviser with respect to the subject of the trust, and under such circumstances whatever direction was or may have been given the defendant by the plaintiff was influenced by the superior knowledge, judgment, and advice of the defendant. As to that the defendant himself testified that he asked the plaintiff if he wanted to sell each time the defendant himself sold Tintic Standard stock dealt in by him; that he told him, "I think I would sell so many shares at such a price; do you want to sell your stock?" and, "I told him what I was doing all the time and

asked him if he wanted to do the same as I was doing in each instance." The plaintiff testified that if the defendant "was buying himself I knew that the stock was going up higher and higher and in that case I won't sell," and that he would not have requested the defendant to sell any of the stock had he known that the defendant was not then selling but buying Tintic Standard stock. Thus, while it is true that the plaintiff requested the defendant to sell the stock, or portions thereof, at the time the stock was secretly taken by the defendant, yet it is also true that prior to such requests the defendant had counseled and advised the plaintiff with respect to selling his stock and that such requests were influenced, if not directly caused, by such counsel and advice.

It was clearly shown, and there is no conflict in the evidence concerning it, that the defendant had not sold the stock nor any part of it as he represented in his ▮ letters to plaintiff he had done. Defendant himself testified that he did not sell it, that he "just took the stock," and when he was asked, "Q. So you never did sell that stock, did you?" he answered, "A. I just—I advanced him the money." Nevertheless he wrote the plaintiff and falsely stated that he had sold it. Thus, upon defendant's own testimony, it appears that he had not sold the stock, but merely "took the stock" and advanced plaintiff money on it. And on the record the conclusion is justified that the defendant, because of his superior knowledge of the conditions of the mine and the rapid increase of the value of the stock, took plaintiff's stock in breach of his trust for his own use and benefit and to the injury and detriment of the plaintiff. The record discloses without dispute that the market price of the stock on April 28, 1924, was $4.07½ a share, December 24, 1924, $9, January 12, 1925, $9, April 29, $10, July 3, $11, September 3, $13.25; and that the highest market price of the stock between the time the defendant reported to the plaintiff he had sold the stock and the time of the trial was $15 a share. Between 1918 and May 29, 1925, the

defendant was actively dealing in Tintic Standard stocks involving about 14,600 shares, buying and selling, and when this action was commenced May 29, 1925, he indisputably was the owner and possessor of 1,500 shares of such stock. He then, had he chosen so to do, could have delivered to the plaintiff, in accordance with the demands of the complaint, 1,300 shares of such stock and accounted for the dividends received by him on plaintiff's stock. Whether the defendant at the time of the trial or of the rendition of the judgment was the owner or possessor of any Tintic Standard stock is not shown. On the day the action was commenced he transferred 1,200 shares to his uncle, which, however, he testified, were later returned to him. When he was first called as a witness he was asked when he finally, if at all, sold the plaintiff's stock. He answered, "I don't care to answer that question; I don't know whether I have that stock in my hands now or not." Then he was asked if he still had 1,300 shares of Tintic Standard stock in his possession, and he answered, "I don't care to answer. I don't think that pertains to the case." "Q. Do you decline to answer that question? A. Yes, sir"—and made no answer as to the amount of such stock, if any, then owned or possessed by him. Later, when again called to the stand, he, in response to questions asked him by his counsel, answered that between December 26, 1924, and September 30, 1925, he sold the 1,300 shares of plaintiff's stock at from $9 to $13.25 a share, but accounted to the plaintiff on the basis of only from $4 to $8.75 a share, less 25 per cent of claimed profits, $1,600 for services rendered, and $1,016.08 as the purchase price and commission in purchasing 1,000 shares of Eureka Standard stock for the plaintiff, and wholly failed to account to the plaintiff for any dividends received by him on the Tintic Standard stock, amounting to about $1,540.

Thus, on the findings of the court in favor of the plaintiff as to the issues presented by the complaint, and against the defendant as to the issues presented by his answer and

counterclaim, the case is one of glaring dishonesty, infidelity, and breach of duty.

On the record the only doubt with respect to the judgment as rendered is this: The court in effect found that the plaintiff did not learn that the sales of his stock were in fact not made, nor of the fraud practiced upon ▮ him, until the last days of June or July 3, 1925, when the deposition of the defendant was taken, at which time it was disclosed by his own testimony that the stock was not sold as reported by him to the plaintiff. On the record it apperas that when the defendant in February, 1925, reported to the plaintiff that he had sold all of his stock and remitted to him what he claimed to be the proceeds of the sales less 25 per cent of claimed profits, $1,600 for services rendered and $1,016.08 claimed to have been paid in the purchase of the Eureka Standard stock, the plaintiff, at that time not knowing that his stock had not been sold as reported, disapproved the report and contended that the defendant was not entitled to the deductions made by him. Thereupon considerable correspondence took place between the parties respecting the matter without coming to any understanding or agreement. Then the plaintiff came on to Salt Lake City, and on inquiries made concerning the transactions he for the first time was informed that no sales in fact were made of his stock and promptly commenced this action, on May 29, 1925. In his complaint he, among other things, alleged that he was informed and believed and so alleged the fact to be that the defendant in fact had not sold any of his stock and had falsely represented to him that he had sold it; that the defendant in breach of his trust had taken the stock for his own use and benefit and had wrongfully withheld dividends belonging to the plaintiff; and that the defendant be required to surrender and deliver up the stock or pay him the value thereof together with the dividends received by the defendant, and repudiated the purported sales of the Tintic Standard stock and the purchase of the Eureka Standard

stock claimed by the defendant to have been purchased for the plaintiff's use and benefit. Thus, upon plaintiff's own complaint, it appears that he had discovered the fraud and repudiated the sales and transactions with respect thereto when the complaint in this action was filed. And on the theory that the plaintiff upon discovery of the fraud had the right to repudiate the sales and the transactions concerning them, and to demand the return of the stock or its value, such value ought to have been considered as of the time and complaint was filed, and not as of July 6, 1925, as was considered by the court. There is no direct evidence as to the market price of the stock on May 29, 1925. Still the record without dispute shows that from December, 1924, or January, 1925, the market price and value of Tintic Standard stock rapidly increased, and on April 29, 1925, was $10 a share, July 3, $11 a share, and on September 23, $13.25 a share, and on the record it is reasonably inferable that the market value of the stock when the action was commenced was substantially the same as on July 3, 1925, or at least that there was no substantial difference between such market values. At any rate, on the record, we cannot say that the market value on May 29, 1925, was substantially less than it was on July 3, 1925, and that the court therefore erred in considering too great a value at the time of the discovery and repudiation. And of course the burden was on the defendant to show error. However, no point is made by the appellant that the court, in finding and determining when the fraud was discovered and the repudiation made ought to have found the time to be when the complaint was filed, instead of July 3, 1925. Nor is there any claim made that the value of the stock on July 3, 1925, was greater than on May 29, 1925. The appellant's chief contention is that the plaintiff had not the right to repudiate the sales or any of the transactions, and that his measure of damages, if he was entitled to any, was the difference between the price at which defendant reported to the plaintiff the defendant had sold the stock and the then market value of

the stock, and that the defendant was not even required to account to the plaintiff the price the defendant received for the stock, which he himself testified was from $9 to $13.25 a share.

There is another question discussed whether or not the plaintiff was entitled to recover the value of the stock at the highest market price between the time of the ■ purported sales and the time of the trial, which was shown to be $15. It is sufficient to say that the findings, conclusions, and judgment do not proceed on such theory, and, there being no cross-assignments by the plaintiff challenging the course pursued by the court, we are precluded from reviewing such a question and therefore express no opinion concerning it.

So, for the reasons heretofore stated, we are of the opinion that the judgment of the court below should be affirmed, with costs. Such is the order.

THURMAN, C. J., and CHERRY and HANSEN, JJ., and CHRISTENSEN, District Judge, concur.

FRICK, J., did not participate herein, being absent ill when cause was submitted.