**PHILLIPS PETROLEUM COMPANY,**
Appellant,

v.

**Heber A. PETERSON and Astrid N. D. Peterson, Appellees.**

**PHILLIPS PETROLEUM COMPANY,**
Appellant,

v.

**John H. HASLEM and Rebecca H. Haslem, Appellees.**

Nos. 4876, 4878.

United States Court of Appeals, Tenth Circuit.

Dec. 21, 1954.

George L. Sneed, Bartlesville, Okl. (R. L. Foster, H. D. Turner, James G. Williams, Jr., Bartlesville, Okl., Clair M. Senior and Hugh C. Garver, Salt Lake City, Utah, on the brief), for appellant.

Frank C. Hubbard, Los Angeles, Cal. (Olin Wellborn III, Los Angeles, Cal., Ray Dillman, R. Earl Dillman, Roosevelt, Utah, and Hugh W. Colton, Vernal, Utah, on the brief), for appellees.

H. M. Gullickson, Billings, Mont., A. T. Smith, Denver, Colo., Macdonald & Halsted and Alexander Macdonald, Los Angeles, Cal., Harry D. Page, Hawley C. Kerr, Tulsa, Okl., Frank F. Jestrab, Bjella & Jestrab, Williston, N. D., Jack M. Campbell, Roswell, N. M., and Oliver Seth, Santa Fe, N. M., amici curiæ.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

This appeal involves the validity of a unitization provision in certain oil and gas leases. It reads as follows:

"12. Lessee shall have the right to unitize, pool, or combine all or any part of the above described lands with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions, and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation and, particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement. In the event that said above described lands or any part thereof, shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the production therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalties to be paid hereunder to lessor, be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract of land; and the royalty payments to be made hereunder to lessor shall be based upon production only as so allocated. Lessor shall formally express lessor's consent to any cooperative or unit plan of development or operation adopted by lessee and approved by any governmental agency by executing the same upon request of lessee."

In the fall of 1945 lease men of Phillips Petroleum Company [1] went into the community of Roosevelt, Utah, for the purpose of obtaining a block of leases. A meeting was held at Leeton, Utah, at which the leading landowners of the community were present. It lasted from 7:30 p.m. until about midnight. Phillips' representatives passed out copies of the lease form. [2] It was read to the landowners section by section. Section 12, the unitization clause, was specifically explained and discussed. The landowners took the lease form home for study and one landowner consulted with an attorney with respect thereto. The lease form provided for a primary term of 10 years. The landowners asked for a 5-year term. It was finally agreed that

---

1. Hereinafter called Phillips.

2. The form is known as Bradford-Robinson Form 950–C.

the primary term should be 7 years and that there should be an express covenant for seismographic work on the block within 1 year. On the day following the meeting, Phillips' representatives contacted the landowners and secured the signed leases.

Phillips completed its seismographic work and having determined that the leaseholds lay within a favorable structure, proceeded to take correction leases where there were minor errors in original leases.

The Carter Oil Company [3] early in 1949 submitted an application to the United States Geological Survey for the designation of a unit which embraced part of what is now known as the Roosevelt Unit Area. Carter was advised by the Geological Survey that its application was rejected until certain lands, which included those involved in this action, were included in the area and certain other lands were excluded therefrom. Phillips pooled its geological and geophysical information with that of Stanolind Oil and Gas Company and that of Carter. Thereafter, on July 20, 1950, Carter submitted a new application to the Geological Survey, incorporating the suggested changes, and on August 17, 1950, the Geological Survey approved such application by designating the unit as the Roosevelt Unit Area. All of Phillips' lessors were notified in writing that the Roosevelt Unit Area had been designated and that preliminary approval of the Roosevelt Unit Agreement had been obtained and were requested to formally express their approval of the Unit Agreement by executing a written consent. A great majority of the lessors who had executed leases to Phillips and whose lands lay within the Roosevelt Unit Area executed a consent to the Unit Agreement. The Unit contains state public lands and Indian lands. The State Land Board of Utah, pursuant to Title 86–1–48.25, Utah Code Ann.1943, as amended, U.C.A.1953, 65–1–63,[4] approved the Roosevelt Unit Agreement. On May 1, 1951, Phillips, pursuant to § 12 of the leases, executed a consent and commitment. Subsequently, on October 30, 1951, pursuant to authority delegated to him by the Secretary of the Interior, Evan L. Flory, Acting Assistant Commissioner of Indian Affairs, approved the Roosevelt Unit Agreement.

Phillips, being unable to obtain formal consents from certain lessors who protested the validity of the unitization section of their leases, filed 32 actions, seeking declaratory judgments adjudging that § 12 was valid and binding on the lessors. Thirty-one were brought to issue and consolidated for trial.

The trial court found that the Phillips lease and § 12 were uncertain in that they failed "to reveal":

"(a) What is meant by 'in the same general area.'

"(b) What cooperative or unit plan of development or operation may be entered into.

"(c) What the terms of such cooperative or unit plan will be.

"(d) What governmental authority is required to approve such cooperative or unit plan.

"(e) From what viewpoint such approval shall be given or withheld.

---

3. Hereinafter called Carter.

4. Title 86–1–48.25, which was approved in March, 1945, in part reads:
   "The state land board is authorized to join on behalf of the state of Utah in cooperative or unit plans of development or operation of oil and gas pools with the United States government and its lessees or permittees and others in such form as may be acceptable to it, to modify or amend the same from time to time as in its judgment it may deem advisable, to consent to and approve the designated participating area and any extension or contraction thereof and to do all acts and things which it considers necessary or advisable to make operative such unit plan or plans; and for such purposes it is hereby authorized with the consent of its lessees or permittees to modify and change any and all terms of leases issued by it to facilitate the efficient and economic production of oil or gas from the lands under its jurisdiction: * * *."

"(f) What the terms, conditions and provisions of the lease, as modified by the cooperative or unit plan, will be.

"(g) What drilling and development requirements, if any, such cooperative or unit plan will contain.

"(h) What the term of the lease, as extended by the term of the cooperative or unit plan, will be.

"(i) What the lessors' royalty will be in the event of commitment to a cooperative or unit plan."

It further found:

"9. Said lease is an integrated instrument. There were no extrinsic agreements nor understandings between the lessors and the lessee in said lease as to any meaning to be attached to any of the terms used in said paragraph 12. There were no extrinsic agreements nor understandings between the lessors and the lessee in said lease as to any method or means for resolving any of the uncertainties set forth above in Finding No. 8.

"10. At no time was there in existence any usage or custom with reference to which the lessors and lessee in said lease contracted, which would explain the meaning of any terms used in paragraph 12 or which would resolve any of the uncertainties set forth in Finding No. 8.

"11. At no time was there in existence any usage or custom of which any of the lessors in said lease had knowledge, or of which any of said lessors could be charged with knowledge, which would explain the meaning of any terms used in said paragraph 12 or which would resolve any of the uncertainties set forth in Finding No. 8."

The trial court concluded that the approvals by the Assistant Commissioner of Indian Affairs and by the State Land Board of the State of Utah did not satisfy the § 12 requirement of approval by "any governmental authority"; that § 12 was invalid and unenforceable because of uncertainty and indefiniteness, and that no valid exercise of the power given by § 12 could be made, because of the rule against perpetuities. Accordingly, the trial court concluded that the leases involved in these actions had expired by their terms and entered judgment in favor of the defendants. Phillips has appealed. Two representative cases are presented and it has been stipulated that the decision in those cases will be binding as to the remaining cases.

■ Section 12 does not violate the rule against perpetuities, unless the unitization or pooling agreement accomplishes transfers of interests in real property, or, otherwise stated, effects cross-transfers of property interests among the parties to the agreement.

It will be observed that § 12 expressly provides:

" * * * In the event that said above described lands or any part thereof, shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the production therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalties to be paid hereunder to lessor, be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract of land; and the royalty payments to be made hereunder to lessor shall be based upon production only as so allocated. * * *"

Thus, it appears that the effect of unitization was to be only with respect to allocation of production and the computation of royalties and was not to effect cross-transfers of royalty interests. The Unitization Agreement clearly so provided.[5]

5. The Unitization Agreement in part reads: "8. * * * Nothing herein, however, shall be construed to transfer title to any land or to any lease or operating agree-

Moreover, an intent that there shall be no cross-transfers of royalty interests may be derived from a provision that proportions of the unit production shall be allocated to the respective tracts and that the portion so allocated to each tract shall be treated as if it had actually been produced from such tract. By such an allocation method of participation in unit production the parties clearly demonstrate their intention that the royalty and working interest ownership within each tract immediately prior to unitiza-ation shall continue in effect, since the static ownership within the respective tracts comprising the unit is the basis and the only basis upon which the allocation method of participation functions.[6]

While there is a contrariety of authority on the effect of the pooling agreement with respect to whether a cross-transfer of royalty interests results, we are of the opinion the conclusion we have reached is supported by well-reasoned and more persuasive authority.[7]

█ Finally, there being no time fixed within which unitization was to be effected, it must be implied that the parties intended it to take place within a reasonable time,[8] and a reasonable time, under the facts and circumstances, would be well within the limitation of the rule against perpetuities. Hence, had there been cross-assignments, the rule against perpetuities would not have been violated.

Provisions in oil and gas leases for unitization have become a practical necessity in the oil and gas industry, because of governmental rules and regulations imposing strict requirements for the proper spacing of wells and the granting of production allowables on the basis of formulae predicated in whole or in part on the quantity of acreage from which the oil and gas can be efficiently recovered by one well completed in the reservoir involved. Permeability, porosity, and other information relating to the producing zone can be scientifically analyzed and a reasonably accurate determination made of the area from which the oil can be efficiently recovered by a well in that zone for the purpose of fixing the appropriate size of the pooled units for developing such zone. See Hoffman, Voluntary Pooling and Unitization, pp. 87, 88. Moreover, limiting the number of wells to be drilled to those that will efficiently recover the oil and the elimination of the drilling of unnec-

---

ment, it being understood that under this agreement the Unit Operator, in its capacity as Unit Operator, shall exercise the rights of possession and use vested in the parties hereto only for the purposes herein specified.

\* \* \* \* \*

"11. \* \* \* All unitized substances produced from each participating area established under this agreement, \* \* \* shall, \* \* \* be deemed to be produced equally on an acreage basis from the several tracts of unitized land of the participating area \* \* \* and, for the purpose of determining any benefits accruing under this agreement, \* \* \* each tract of unitized land shall have allocated to it such percentage of said production as the number of acres in such tract bears to the total acres of unitized land in said participating area. \* \* \* "

6. Hoffman, Voluntary Pooling and Unitization, p. 168.

7. Kenoyer v. Magnolia Petroleum Co., 173 Kan. 183, 245 P.2d 176, 179; Cool-

baugh v. Lehigh & Wilkes-Barre Coal Co., 218 Pa. 320, 67 A. 615; Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785, 791; Lynch v. Davis, 79 W.Va. 437, 92 S.E. 427, 430, L.R.A.1917F, 566; Arkansas Louisiana Gas Co. v. Southwest Natural Production Co., 221 La. 608, 60 So.2d 9. Contra: See Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 476; Tanner v. Title Insurance & Trust Co., 20 Cal. 2d 814, 129 P.2d 383, 386; Hudson v. Newell, 5 Cir., 172 F.2d 848, 852; Whelan v. Placid Oil Co., 5 Cir., 198 F.2d 39, 41–42.

Texas and Federal cases cited above may be distinguishable, in that they arose in Mississippi and Texas, where the concept prevails that the landowner is the owner of oil in place underneath his land. Cf., also, Sohio Petroleum Co. v. Jurek, Tex.Civ.App., 248 S.W.2d 294, 298.

8. Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106.

essary wells will prevent underground waste and the loss of oil which would result if unnecessary wells were drilled.

By the Act of July 3, 1930, 46 Stat. 1007, 30 U.S.C.A. §§ 184, 226, unit development and operation of public lands for oil and gas was permitted with the approval of the Secretary of the Interior. By the Act of March 4, 1931, 46 Stat. 1523, 30 U.S.C.A. §§ 184, 226, Congress again provided for unit development and operation of public lands for oil and gas with the approval of the Secretary of the Interior. By the Regulation of April 4, 1932, 53 I.D. 640, the Secretary of the Interior prescribed that no oil and gas prospecting permit would be thereafter issued which did not contain a covenant to operate pursuant to such unit plans as might be approved or prescribed by the Secretary of the Interior.

By the Act of August 21, 1935, 49 Stat. 674, Congress provided in § 17 thereof, 30 U.S.C.A. § 226, that the Secretary of the Interior might require all leases issued after the effective date of that Act to be conditioned upon an agreement by the lessee to operate under such unit plan as the Secretary of the Interior might determine to be practicable and necessary or advisable in the public interest and that such plans should adequately protect the rights of all parties in interest, including the United States.

The first regulations as to procedures for unitization were issued by the Secretary of the Interior, June 4, 1931, 53 I.D. 386, and as early as August 7, 1934, the Secretary approved a form of unit agreement as standard for permittees, lessees and others. In January, 1936, the Department of the Interior published a unit agreement, "Form A," which represented the standard form of unit agreement from that time until 1943. In 1943, the Department of the Interior published a new standard form which made minor modifications in the 1936 Form A.

At the trial Phillips introduced 95 unit agreements, being all of those approved by the United States Geological Survey for lands in Colorado, Idaho, Montana, Nevada, North Dakota, South Dakota, Utah and Wyoming during the period from August 6, 1940, through December 29, 1947. While there were minor variations in the plans, in all points material to the royalty owners' interests such agreements followed essentially the same pattern.

Likewise, the procedure for effecting such unitization has been uniform by reason of the rules and regulations of the Department of the Interior and the practice in that Department. The first step in the formation of a unit in an unproven area embracing Federal public lands or Indian lands subject to Federal supervision, is made by the filing with the local supervisor of the United States Geological Survey an application for designation of the area as one logically subject to development under a unit agreement and for determination of the depth of a test well. With such application the proponent of the unit agreement submits a plat of the proposed unit area and all available geological, geophysical, and other data relating to the proposed unit area, showing that unitization is necessary and advisable in the public interest. If the application is approved, the Director of the United States Geological Survey designates the area as one logically subject to development under a unit plan of operation and specifies the depth of the initial test well. The proponent of the unit plan must then invite all the owners of any right, title or interest in the oil or gas deposits to be unitized to join the agreement. Where state-owned land is to be unitized, approval of the agreement by the appropriate state officials must be obtained prior to its submission to the Department for final approval. After all of the parties have consented to the agreement, either by executing it, or a counterpart thereof, or by consent and commitment pursuant to a unitization clause such as § 12, the unit plan is submitted to the Secretary or his authorized agent for final approval, which is by certificate upon a determination that such agreement is necessary and advisable in the public interest and

is for the purpose of more properly conserving natural resources. A prerequisite to determination that a particular area is suitable for unitization is the submission of acceptable geological data, indicating a structure, and only lands reasonably believed to be located on the structure will be included in the unit area. Inclusion of more than one structure in a single unit is not permitted.

It should be remembered that the Act of August 21, 1935, expressly provides that the plan shall adequately protect the rights of all parties in interest. That standard has been adhered to.

Thus, it will be seen that unitization is a conservation measure which benefits both lessor and lessee and tends to prevent waste of a natural resource.

Anticipatory provisions in leases for the commitment by the lessee of such leases to unitization, of necessity must be in general terms. Neither the lessor nor the lessee has any way of knowing at the time the lease is taken the facts with respect to which it will be necessary for the lessee to apply his power. It is not practicable for the lessee to await the ascertainment of such facts. He knows from experience that because of the possibility of many changes in ownership of the lessor's interest as time goes on, it may be difficult to effect an agreement for unitization after the lease is taken, if the right to unitize is not included in the lease itself.

■ The practice of unitization by a power granted the lessee in advance, if faithfully carried out, will be fair and profitable both to the lessor and lessee, and is vital to the oil and gas industry in the interests of the conservation of both natural and material resources. It should be upheld, although the grant of power is in general terms, because it is subject to implied terms that will prevent arbitrary and unfair dealing, will require compliance with the implied covenants in the lease for the benefit of the lessor and will impose a rigid standard of good faith on the part of the lessee.

■ The provision in § 12 that "this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation and, particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement," is purely contractual between the lessor and the lessee. In other respects, the provisions of § 12 are a grant of power to the lessee in its own behalf with respect to its working interest and the lessor's behalf with respect to his reserved interests to unitize all or part of the lands described in the lease, under a cooperative or unit plan of development and operation and to enter into a unitization agreement that will effectuate such unit plan. The relationship between the lessor and lessee under § 12 is, at least, analogous to that of principal and agent.[9] It is in the nature of a power coupled with an interest, and is, therefore, irrevocable. Hence, our problem is not whether § 12 is sufficiently definite and certain to bind the lessor and lessee to enter into a future agreement between the lessor, lessee and other lessors or lessees or landowners, but whether its provisions are sufficient to grant authority to the lessee, as the lessor's agent, to enter into a unit plan for development and operation and to make a future contract to effectuate such plan.

■ The authority of an agent may be couched in general terms; may be as broad as the principal chooses to make it; may grant power to the agent to exercise his judgment and broad discretion, and may vest in the agent the authority to do for his principal any lawful act performable by the principal.[10]

9. Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106, 1109.

10. Edwards v. Heralds of Liberty, 263 Pa. 548, 107 A. 324, 325; Adams Mining Co.

■ It is well settled that an agent must not, except with his principal's full knowledge and consent, assume any duties or enter into any transaction concerning the subject matter of the agency in which he has an individual interest or represents interest adverse to those of his principal.[11]

■ It is equally well settled that an agent may act with respect to matters involving interests adverse to his principal, where the principal possesses full knowledge of the facts and consents thereto.[12] In such a case the agent owes the duty to exercise a high degree of good faith and loyalty for the furtherance and advancement of the interest of his principal.[13]

■ Where there is also a lessor-lessee relationship the agent-lessee is also obligated to keep and perform the implied covenants of his lease.

■ A lessee is bound by implied covenants in the lease to diligently explore and develop the lease, and to do so under a fair unitization plan, if unitization is effected; to market the production if the oil and gas is found in paying quantities; to do that which an operator of ordinary prudence, having due regard for the interests of both the lessor and the lessee, would do;[14] and, in case of unitization, to act fairly and in good faith, with due regard for the lessors' interests, and to provide for a fair apportionment of the oil produced.[15] The lessee clearly may not act arbitrarily or capriciously.[16]

Largely, if not altogether, the interests of Phillips and its lessors in entering into the plan of unitization and a contract to effectuate such a plan were mutual. What would serve the best interests of Phillips would likewise serve the best interests of its lessors. Both were interested in a plan of development and operation that would recover the most oil from the lands covered by their leases and in obtaining an allocation to such lands of a fair and just proportion of the oil produced from the reservoir. It is true that limiting the wells to be drilled to a number that would secure the most recoverable oil from the reservoir and prevent the loss of recoverable oil through underground waste would reduce Phillips' development and operational costs. But so to do would be beneficial, not detrimental, to the interests of Phillips' lessors. They, too, are equally interested with Phillips in preventing underground waste and securing the production of all of the recoverable oil from the reservoir. It may, therefore, be doubted that in reality Phillips' interests were in any wise adverse to those of its lessors.

v. Senter, 26 Mich. 73, 76; McClung's Ex'rs v. Spotswood, 19 Ala. 165, 171–172; Link, Petter & Co. v. Pollie, 241 Mich. 356. 217 N.W. 60, 61; Restatement, Agency, Vol. 1, § 17.

11. Tatsuno v. Kasai, 70 Utah 203, 259 P. 318, 321, 62 A.L.R. 54; Robertson v. Chapman, 152 U.S. 673, 681, 682, 14 S. Ct. 741, 38 L.Ed. 592; Restatement, Agency, Vol. 2, §§ 389, 390.

12. Adams Mining Co. v. Senter, 26 Mich. 73, 76, 77; Pauly v. Pauly, 107 Cal. 8, 40 P. 29, 32, 33; Alexander v. The Northwestern Christian University, 57 Ind. 466, 476; Tudesco v. Wilson, 163 Pa. Super. 352, 60 A.2d 388, 391; Thompson-Starrett Co. v. Mason's Adm'rs, 304 Ky. 764, 201 S.W.2d 876, 880.

13. Cassidy Fork Boom & Lumber Co. v. Terry, 69 W.Va. 572, 73 S.E. 278, 287; Restatement, Agency, Vol. 2 § 390.

14. Phillips v. Hamilton, 17 Wyo. 41, 95 P. 846, 848; Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, 811, 814; Pohlemann v. Stephens Petroleum Co., 10 Cir., 197 F.2d 134, 136; Wolfe v. Texas Co., 10 Cir., 83 F.2d 425, 432, certiorari denied 299 U.S. 553, 57 S.Ct. 15, 81 L.Ed. 407; Merrill, Covenants Implied in Oil and Gas Leases, 2d Ed., §§ 3, 4.

15. Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106; Gillham v. Jenkins, 206 Okl. 440, 244 P.2d 291, 294; Toomey v. State Board of Land Commissioners, 106 Mont. 547, 81 P.2d 407, 422; Merrill, Covenants Implied in Oil and Gas Leases, 2d Ed., 1953 Supp. p. 157. Boone v. Kerr-McGee Oil Industries, 10 Cir., 1954, 217 F.2d 63.

16. Toomey v. State Board of Land Commissioners, 106 Mont. 547, 81 P.2d 407, 422.

■ Here, the lessors of Phillips knew the benefits that would flow to Phillips from a unitization plan and agreement. They were fully apprised of the interest of Phillips in a unitization plan and agreement. They knew that Phillips, in entering into a unitization plan and agreement would act for itself with respect to its working interest, as well as for the lessors with respect to their royalty interests. With such knowledge, by § 12, they clearly manifest their consent for Phillips to act in its and in their behalf, in entering into a plan of unitization and agreement, subject to the condition that the plan and agreement should be approved by a governmental authority. It follows that, even if it can be said that the interests of Phillips were to some extent adverse to the interests of the lessors, they were bound by their consent, given with full knowledge of the facts.

The lessors, in effect, agreed that subject to such limitations as were written into § 12, and such further limitations as were implied in the lease and relationship created, Phillips was authorized to enter into a plan of unitization and an agreement to effectuate such plan, which would be binding on the lessors, provided it was approved by a governmental authority.

■ We are of the opinion that § 12 fully authorized Phillips to unitize the land covered by the leases involved in the instant case and to enter into a contract to effectuate the unit plan of development and operation, so long as Phillips acted in good faith, fairly, and with a due regard for the interests of the lessors, as well as its own interests, and that § 12 was sufficiently specific to measure the scope of the agent's authority in the premises.

■ We are of the opinion that the State Land Board of Utah, which was authorized to join in unit plans of development of oil and gas pools with the United States, its lessees or permittees and others, and to approve contracts to effectuate such unit plans of development, was a governmental authority within the meaning of § 12. We are likewise of the opinion that the Secretary of the Interior, who is authorized to require and approve unit plans for development and operation for oil and gas of allotted Indian lands and of unallotted Indian lands within any Indian reservation, or any lands owned by any tribe, group, or band of Indians under Federal jurisdiction[17] and to approve contracts to effectuate such unit plans of development and operation, is also a governmental authority within the meaning of that term, as used in § 12. Both such state and Federal agencies were authorized to enter into such unit plans of development and to approve contracts effectuating such plans at the time the leases involved herein were entered into. We know of no other state or Federal governmental authority so authorized. We think it must therefore be concluded that in using the term "governmental authority" the parties had in mind such state and Federal agencies.

The judgments in both cases are reversed and the causes remanded, with instructions to enter judgments as prayed for in the complaints.

HUXMAN, Circuit Judge, concurs in the result.

17. Act of May 11, 1938, 52 Stat. 347, 348, 25 U.S.C.A. § 396a et seq.; Act of March 3, 1909, 35 Stat. 781, 783, 25 U.S.C.A. § 396; 25 C.F.R., parts 186 and 189.