## Thompson-Starrett Co., Inc., v. Mason's Adm'rs.

October 25, 1946.

Rehearing denied June 3, 1947.

Chester D. Adams, Judge.

Stoll, Muir, Townsend, Park & Mohney and J. Arthur Leve for appellant.

Allen, Duncan & Duncan for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming in part, reversing in part.

The case concerns an agreement executed preliminary to the contract with the United States for the construction of the Grand Coulee Dam and Power House in the State of Washington. The suit was instituted by Thompson-Starrett Company, of New York, against the administrators of the estate of Silas B. Mason, deceased, to recover $26,666.67, with interest from December 31,

1935, alleged to have been paid him in reliance upon the truth of certain misrepresentations and his failure to perform the consideration which induced the promise to pay. The defendants' counterclaimed for $30,033.33, with interest from various dates in 1938, alleged to be due the estate under the same contract. The judgment was for the defendants both on their counterclaim and in dismissing the petition.

Silas B. Mason was a large stockholder and chairman of the board of directors of the Silas Mason Company, which was engaged in heavy construction work. The Thompson-Starrett Company was in similar business. Mason interested its officers in joining with others to bid for the contract for erection of the Dam. On June 7, 1934, the company addressed a letter to Mason, individually, reciting and confirming the agreement that day entered into by it and "yourself" respecting the submission of the bid in connection with a third company from San Francisco. It was agreed that Thompson-Starrett Company should provide $750,000 of the necessary deposit of $2,000,000, and if the contract should be awarded to furnish an additional $250,000; that its share of the profits should be that part which $1,000,000 bore to the total capital supplied by the contractors, and in no event should its commitment be in excess of $1,000,000. It was understood, as is recited, that the enterprise would require between $6,-000,000 and $7,500,000 capital, and if the contract should be awarded the group, Mason agreed to find others to subscribe the additional capital. The details of the venture were to be looked after by Mason, and he, as trustee, would "handle the funds" advanced by the company. The letter was endorsed, "Accepted, Silas B. Mason."

A bid submitted in July, 1934, in the names of the Silas Mason Company, Walsh Construction Company and Atkinson-Kier Company was accepted by the United States. These companies are referred to in subsequent documents and in this record as "the contractors." They, with Thompson-Starrett Company, created a corporation with $5,000,000 capital, through which they would and did execute the work, although the contract was to be made with the contractors since there could be no assignment. This agency company was named Mason-

Walsh-Atkinson-Kier Company. It is referred to as MWAK. Thompson-Starrett Company subscribed $1,000,000 for ten thousand shares of the stock; the Mason Company $1,500,000, and the other two companies $1,250,000 each. The Thompson-Starrett stock was held in the name of Silas B. Mason as trustee.

Difficulty was experienced in obtaining surety on the performance bond. A plan was worked out whereby $2,000,000 should be deposited in escrow with a New York bank as indemnity of the surety companies. This would deplete the working capital of MWAK. A controversy arose between Mason and Thompson-Starrett with respect to additional financing of the project. The principal complaint of Mason was that Thompson-Starrett had a limited liability of $1,000,000, i. e., the amount of its stock in MWAK, while the Mason Company and the other contractors should have to provide more capital and their entire assets would be subject to liability. There seems to have been some other differences, but they were swallowed up in this main one. This resulted in a compromise agreement and a more definite understanding and arrangement. It was evidenced by another letter addressed by Thompson-Starrett Company to Mason, individually, dated September 14, 1934. The letter affirmed the agreement of June 7th, except as therein modified. This letter was endorsed "Confirmed and accepted. Silas B. Mason, Trustee, as aforesaid." It also stated the contract as being between Thompson-Starrett Company and "yourself," referred to what had been done by Mason in carrying out the terms of the June 7th agreement, particularly the organization of MWAK, and the contract for the construction of the Dam, and other documents, copies of which were made parts of this agreement. It is noticeable that in this letter Silas B. Mason is constituted not only a trustee of Thompson-Starrett for the holding of the stock, but is clearly designated as the representative of Thompson-Starrett for the entire enterprise, subject to certain reservations with respect to nomination by it of some of the major operating officers or employees of MWAK. Provision is made for the selection of another as its representative in case of the death of Mr. Mason. That part of the contract which is particularly pertinent to this litigation is as follows:

"We understand that it may be necessary for the Agent to borrow sums of money in addition to the $5,-000,000.00 of capital subscribed in order to carry on the enterprise, and that you have established credit so that moneys may be borrowed for that purpose by the Agent to the extent of $1,000,000.00 with interest at the rate of ——— per cent per annum.

"In consideration of your arranging for that credit and the benefit to us from so doing and in settlement of certain disputes as to our respective rights and obligations under letter agreement of June 7th, 1934, we hereby agree that from any dividends payable on the $1,000,000. of stock held by you for our account or which we may elect to hold in our name, either you may retain 10% of the amount of such dividends or other distribution which may be made by the Corporation (exclusive of return of capital investment), or if we hold the stock in our name that we will pay over such 10% to you therefrom. If said credit arranged for by you for the Agent Corporation is used by the Agent Corporation to the extent of $1,000,000.00, then we agree that you may retain or we will pay you an additional 6 2/3% of any and all dividends or distributions (exclusive of return of capital investment) paid by the Corporation to you, if you hold the stock for us, or paid to us, if we take over the stock. If the full credit of $1,000,000.00 is not used by the Agent Corporation, then, instead of your retaining or being paid by us, as the case may be, such additional 6 2/3% of dividends or distributions on said stock, you shall have such proportion of 6 2/3% of such dividends or distributions as the credit used by the Agent Corporation bears to $1,000,000."

As of December 31, 1935, a dividend was declared by MWAK and $200,000 was received by Silas B. Mason, as trustee of Thompson-Starrett. Upon the representation made in the contract of September 14, 1934, that Mason had established credit for the enterprise, and the statement that $500,000 of that credit had been used as contemplated, the dividend check was endorsed over to Thompson-Starrett and it gave Mason its check for 10% of the dividend, plus 3 1/3% on account of the use by the agent Company of the credit established by Mason, the total being $26,666.66. Mason died in April, 1936, four months after the payment.

The petition in which the recovery of this sum is prayed charges that Mason had not in fact established any credit for the enterprise at the time the contract of September 14, 1934, was executed, as he had represented, and had never done so. It is charged that no credit established by Mason had been used by MWAK. Reliance upon the statements in the agreement and the later discovery of the real facts were appropriately pleaded. A traverse and certain denied affirmative pleas raised those issues.

Nowhere in the two documents evidencing the contract between these parties is the name of the Silas Mason Company mentioned. Nowhere in the pleadings does it appear. The suit, as well as the counterclaim, was prosecuted as if this were an individual matter. But the Circuit Court found from the evidence that in the negotiations and contracts, as well as in the operations in respect to establishing credit, Mason was acting as the spokesman, representative and agent of the Silas Mason Company, and that Thompson-Starrett Company knew it, actually or constructively. The finding is rested upon the prior course of dealing between the parties and complete information of the relation and situation in the present transaction. We have no doubt that Mason's dominant motive was to serve his own company, or that Thompson-Starrett Company realized and knew this. In this relationship of trustee of Thompson-Starrett in handling its funds, initially, and in holding its stock in MWAK, he personally was its agent. But that representation is not involved in the case. It seems to have been understood, or must have been known from the circumstances, that Mason would obtain the additional credit on the strength of his own and the other associated companies rather than as an individual. We concur in the chancellor's conclusion of fact that to the extent that Mason represented Thompson-Starrett Company as its agent in getting the four companies together, submitting the collective bid, etc., as well as whatever he did with respect to establishing credit for their joint agent corporation, MWAK, Mason represented both Thompson-Starrett Company and the Silas Mason Company. Perhaps the other two companies also in some acts.

An agent may serve two masters if both consent.

In this instance, knowledge implied consent. This right of dual agency is recognized in the Restatement of the Law of Agency, Secs. 313, 391. There appears no inconsistency in this representation or disloyalty or unfairness to either party. In relation to Mason's activity in having established credit for the venture before the execution of the agreement of September 14, 1934, it does not matter, so far as Thompson-Starrett is concerned, whether he was acting as an individual or as the agent of either or both corporations. The material thing is whether or not he had done so. It is for that service which Thompson-Starrett agreed to pay and did pay. That presents a question of fact although there may be one of law mixed with it.

H. M. Collins, attorney and officer of the Silas Mason Company, testified that prior to the agreement of September 14, 1934, he was advised by Robert D. Scott, a Vice President of the Chemical Bank & Trust Company, of New York, that a line of credit could be established in his bank for the benefit of MWAK upon the endorsement or guarantee of the three contractors. Mr. Scott, who was one of the principal lending officers of the bank, testified that Mr. Mason, personally, the Silas Mason Company and its predecessor, Mason & Hanger Company, had done business with his bank and had been large borrowers for at least 25 years. He was familiar in a general way with the developments of the Grand Coulee Dam enterprise. In connection with it the bank had loaned $800,000 to the Silas Mason Company prior to September 1934. Scott was informed as to the corporate set-up of MWAK, the surety indemnity of $2,000,000 being deposited with his bank as escrow agent. In anticipation of future events and the possibility that a line of credit would be sought, the bank acquainted itself with the responsibility and financial ability of the Walsh Construction Company and Atkinson-Kier Company, it already having that information as to the Silas Mason Company. Said he, "We knew they were able to perform." In August, 1934, in a discussion which was initiated by Collins as to a possible credit for MWAK, Scott gave assurance that it could be had for its legitimate requirements. He would have recommended to the Board of Directors of the bank a credit of $1,000,000 to MWAK upon the guarantee of the other

three companies. It appears that Thompson-Starrett knew that no definite or absolute commitment of any bank for credit had been obtained, for when the amount of interest to be paid was left blank in the paragraph of the agreement of September 14, 1934, reciting that Mason had established credit for MWAK to the extent of $1,000,000, Robert F. McCord, President of Thompson-Starrett Company, raised the question with Mason, who referred him to Collins. McCord further testified that Collins told him in effect "that the bank could not establish a rate of interest because they did not know exactly how much money would be borrowed or for how long a period and until that was definitely determined no interest rate could be fixed."

The terms used in this contract are "established credit" and "arranging for credit," which were, of course, used synonymously. "Arrange" and "establish" are extremely general and variable words. The word "arrange" in such assocation means to prepare. Webster. The Century Dictionary defines "arrangement" as "preparatory measure or negotiation; previous disposition or plan; preparation." It has been held, in the construction of a statute, to embrace an agreement concerning the amount, terms and security for a loan where all that remained to be done was to execute the papers and transfer the money. Union Mortgage Banking & Trust Company v. Hagood, C. C., 97 F. 360, 364; Vol. 4 Words and Phrases, Perm. Ed., Arrangement. The word "establish" means to originate and secure, carrying the connotation of making the preparation stable. Webster's New International Dictionary. "Credit," as used in the commercial sense, means "The ability to borrow, on the opinion conceived by the lender that he will be paid." 1 Bouv. Law Dict., Rawles Third Revision, p. 725. See also Vol. 10 Words and Phrases, Perm. Ed., Credit, p. 347, and Vol. 25 Words and Phrases, Perm. Ed., Line of Credit, p. 325. The language of a business contract should be construed in the light of what intelligent business men would reasonably expect. Literalism is not to be pushed too far. General Acc., F. & L. Assur. Corporation v. Louisville Home Tel. Co., 175 Ky. 96, 193 S. W. 1031, L. R. A. 1917D, 952; 12 Am. Jur., Contracts, Sec. 231. These terms must be given the meaning of creating a relation between some bank

or banks and those whom Mason represented, whereby it could reasonably be said they would be able to borrow the necessary funds in the future.

We conclude that the assurance of the Bank's official, coupled with the experiences of Mason and his companies and the way such transactions are usually handled, afforded a substantial and reasonable justification for the statement or representation of Mason to Thompson-Starrett that credit had been arranged or established for the purpose contemplated. It is not material that nothing was ever borrowed on this credit. The use of that credit was not part of the consideration for the promise to give up 10% of the dividends (one-fifth of the whole) Thompson-Starrett should receive, i. e., $20,000. In reaching this conclusion, we lay aside the claim that there were other controversies compromised and settled by that promise.

The part of the contract to pay Mason 6 2/3% of the dividends received looked to the future—to the proportionate use of credit. The right of the appellant to recover $6,666.66 rests upon proof of its allegation that Mason did not establish the credits which were used by MWAK. The basis of this payment was a loan by the First National Bank of Seattle, Washington. In March, 1935, G. C. Morrill, a Vice President of the Seattle bank, initiated negotiations by writing Colonel M. J. Whitson, a vice president and the principal resident engineer of MWAK, an old friend, soliciting business. Mason (also chairman of the MWAK board) instructed Whitson to investigate the possibilities indicated in the letter and this was approved by the president of Walsh Construction Company, one of the contractors. Pursuant thereto the Seattle bank examined the books of MWAK and made other investigations. After several conferences arrangements for credit were perfected. The aggregate sum of $500,000 was loaned MWAK on its notes without direct endorsement or guarantee of the Silas Mason Company or of the other two contractors. But the three companies executed to the First National Bank of Seattle and the Spokane & Eastern Trust Company an instrument, which, following certain recitals as a preamble, contained covenants, joint and several, to the banks (1) that the contractors would cause MWAK to earn and to receive a sum in

excess of amounts required to discharge its indebtedness to the banks to the maximum of $625,000, and (2) that for liquidation of any debt owing the banks they, as contractors, would endorse and deliver to them checks received from the Government on account of construction estimates, "independently of whether the work is actually done by the contractors or MWAK or by some third person or persons." It is of significance that Thompson-Starrett was not a party to this instrument. This was because it was not a disclosed or, at least, a named party to the construction contract and occupied a collateral relationship. As such it received the benefit of the loan for which the payments to be received were pledged. This connects up with the terms of the agreement of September 14, 1934, with Mason, who, as we have concluded, was acting for and in behalf of the Silas Mason Company. Correspondence and other evidence justify the conclusion that the money was loaned MWAK upon the faith which the banks had in the three contractors and their credit as much as, if not more than, upon the promissory note of MWAK. Thompson-Starrett was kept advised of these transactions. It received copies of the minutes of the directors of MWAK and their executive committee, and some of its officers were assisting in the construction work. It does not seem to us to be of substantial materiality that the credit contemplated and necessary for the prosecution of the venture which Thompson-Starrett and its associates assumed was established after the agreement of September 14, 1934, and elsewhere than in New York. The material and controlling fact is that the credit was established and used as contemplated and Thompson-Starrett received the benefit of it. Mason and his company were, at least in a substantial degree, the effective cause of the result. He or it was, therefore, entitled to the compensation stipulated for its accomplishment. Restatement of the Law of Agency, sec. 448; 3 C. J. S., Agency, sec. 186; 2 Am. Jur., Agency, 301.

Although the agreement of March 20, 1935, with the banks provided for a maximum credit of $625,000, the amount advanced, as we have said, aggregated only $500,000. There were other additional credits given and money borrowed after the dividend was received by Thompson-Starrett in December, 1935, and the payment

to Mason made, but they are involved only in the counterclaim and need not be referred to here.

We are of opinion that the court properly adjudged the plaintiff was without right of recovery.

We consider the counterclaim. The contract purports on its face to be that of Mason individually. The fact that the other party to it knew he was acting as the agent of the Silas Mason Company and that he had paid over the money received by him to it might have raised questions as to its legal right to maintain the action against Mason's personal representatives after his death. 2 Am. Jur., Agency, secs. 239, 402, 431, 436; Williston on Contracts, secs. 281, 283, 285, 287. But those questions were waived by the defendants in accepting the hypothesis of individual liability in their pleading and practice. It does not follow, however, that the administrators could maintain an action to recover additional sums for the use and benefit of the Silas Mason Company. As we have said, all of the pleadings in the case were framed upon the theory of individual liability of Mason, on the one hand, and the right of his personal estate to collect the additional sum of $30,033.-33, on the other. It was specifically alleged in the counterclaim that the plaintiff was indebted to Mason's estate in the sums stated. But it was stipulated during the course of the trial that the action on the counterclaim was being prosecuted for the use and benefit of the Silas Mason Company and that any recovery would be for the corporation. It, therefore, was the real party in interest. Our Civil Code of Practice, sec. 18, requires that "Every action must be prosecuted in the name of the real party in interest," with certain exceptions, including that of "a person with whom or in whose name a contract is made for the benefit of another." Section 21. "The real party in interest, within the meaning of the Code provision, is the party who will be entitled to the benefits of the action upon a successful termination thereof; one who is actually and substantially interested in the subject-matter, as distinguished from one who has only a nominal interest therein." Taylor v. Hurst, 186 Ky. 71, 216 S. W. 95, 96. Mr. Mason could have individually maintained this counterclaim as the agent of the Silas Mason Company. North Western Mutual Life Ins. Co. v. Eddleman, 247 Ky. 116, 56 S. W. 2d

561, 87 A. L. R. 276. 2 Am. Jur., Agency, sec. 432; 39 Am. Jur., Parties, secs. 18, 20, 21; Mechem on Agency, secs. 2022, 2024. But his death dissolved the agency relationship, for obviously it ended his ability to perform the duties of agency. He had no right coupled with a beneficial interest in this contract to pass to his personal estate. There was no money due his estate under this contract made for his principal, even if it should be found on the merits of the case that Thompson-Starrett Company was liable. Any right or authority Mason may have had to maintain the action in his own name was in his capacity as an agent. Before a party may have a controversy judicially determined, it is necessary for him to have an interest in the subject matter (Mc-Cool v. O'Brien, 289 Ky. 729, 160 S. W. 2d 28, 29), and the administrators had none.

There seems to be little specific authority upon this point. We have had reverse situations where principals in powers of attorney to convey land died before consummation, and held that the authority of the agent had then terminated. Moore v. Garred, 223 Ky. 20, 2 S. W. 2d 1036; Richardson v. Lawson, 233 Ky. 73, 24 S. W. 2d 923.

In Tyson v. George's Creek Coal & Iron Co., 115 Md. 564, 81 A. 41, it was held that an administrator of a decedent's estate was not entitled to have reissued to him certificates of stock which had been issued to his decedent as an agent, since the agency was revoked by his death and no interest therein passed to his estate.

In Thrift Bros. v. Baker, 144 Ga. 508, 87 S. E. 676, 677, it developed in the course of a trial in which title to land was involved that there was an administrator's deed in the chain which was void. The plaintiffs sought to escape the dilemma by having the administrator made a party plaintiff and to sue for the use of the original plaintiffs. In holding that the administrator had no right to do so, the court said:

"The attempt, however, was futile. A person may sue in the name of another for his use, if he has a beneficial interest to protect, and the legal right to sue is in the other. Wheeler v. Stapleton, 99 Ga. 731, 27 S. E. 724; Holcombe v. Richmond & Danville R. Co., 78 Ga. 776, 3 S. E. 755; Civil Code, sec. 5689. But there is no

rule which authorizes a person having no beneficial interest to protect to sue in the name of another for his use. The plaintiffs in this case sought to sue in the name of the administrator for their use, on the unfounded hypothesis that they were privies in estate to the administrator. It was contended that although the administrator's deed was ineffectual as conveying title, yet it operated as authority to the grantee and his privies in estate to use the name of the administrator in suing for their use. The administrator is a statutory officer, having authority to sue for the benefit of the estate which he represents (Civil Code, sec. 3933), but there is no authority for him to sue for the use of a stranger. Had the administrator attempted to sue for the use of the plaintiffs in this case, he would not have been authorized to do so; much less would his void deed, by implication, have conferred upon the plaintiffs the right to sue in his name for their use. The amendment, in effect, added a new and distinct party plaintiff, which the statute prohibits.''

The appellees submit authorities to show that by rule of the common law none but parties to sealed instruments can have rights or be subject to liability thereunder, so that a principal who is not named as a party in a sealed instrument is not liable on it and cannot maintain an action on it. See Williston, sec. 296. Therefore, it is argued, after Mason's death only his administrator could sue on the contract. It seems a sufficient response to point out that in this jurisdiction the distinction between sealed and unsealed instruments has been abolished by statute. Ky. Rev. Stats. 371.020. Likewise, must fail the argument on this point predicated upon personal liability of an agent for a contract made in his own name for an undisclosed principal under our conclusion that the principal was known to the other party to the contract.

Generally, a defect in parties or objections based upon the absence of a legal right to maintain an action should be raised by demurrer, plea in abatement or in bar. Civil Code of Practice, secs. 92, 118; Puckett v. Jameson, 157 Ky. 172, 162 S. W. 801; Vassill's Adm'r v. Scarsella, 292 Ky. 153, 166 S. W. 2d 64. There would be a waiver of the defect of the parties by the plaintiff's failure to file a demurrer or appropriate plea regard-

ing the question and in answering to the merits (Hazelhurst Lumber Company v. Carlisle, 130 Ky. 1, 112 S. W. 934), except that the stipulation of fact was a waiver by both parties of formal appropriate pleadings. Cities Service Oil Company v. Taylor, 242 Ky. 157, 45 S. W. 2d 1039, 79 A. L. R. 1374. Underlying that is the fact that the counterclaimants—Mason's administrators—did not prove that the counter-defendant—Thompson-Starrett Company—was indebted to them or to the estate. We are of opinion, therefore, that the court should have dismissed the counterclaim.

The judgment is affirmed to the extent that it dismissed the petition. The judgment on the counterclaim is reversed.

Judge Cammack and Judge Siler dissent from the decision that the counterclaim should have been dismissed.