**Lewis C. BEASLEY, Jr., Appellant,**

v.

**Richard TRONTZ, Janice Heinz, Lynn Jones and Ray Schwartz, Appellees.**

Court of Appeals of Kentucky.

June 8, 1984.

Discretionary Review Denied by Supreme Court Nov. 9, 1984.

James J. Capillo, Marvin L. Henderson, Henderson & Capillo, Lexington, for appellant.

J. Peter Cassidy, Jr., Stoll, Keenon & Park, Lexington, for appellees.

Before HAYES, C.J., and HOWERTON and WILHOIT, JJ.

HAYES, Chief Judge:

In the late September, 1982 the appellant, Lewis C. Beasley, Jr. (Beasley), and his brother-in-law, co-owners of the mare BLACK EYED LUCY and her unnamed INVERNESS DRIVE filly, desiring to sell the mare and foal, inquired of Art Baumohl, a bloodstock agent, about the possibility of appraising and selling the horses for them. Prior to this time, from July to September, 1982, three of the appellees, Richard Trontz, Lynn Jones and Ray Schwartz, desiring to purchase a mare with a pedigree of sufficient quality to be eligible for a breeding season with the stallion, ALYDAR, approached several people, including Baumohl, to submit pedigrees with the requisite qualifications.

Baumohl and Trontz had a pre-existing business relationship. Not only did they own shares in other thoroughbreds together, but Baumohl acted as Trontz's agent in communicating to him and collecting amounts due concerning the horses in which they shared a common interest. On September 30, 1982, Baumohl and Trontz viewed the mare and foal for the first time at the farm of Nancy Penn Morgan where the horses were boarded. After viewing the package, Baumohl sent a letter to Beasley at his home in Hartsville, Tennessee setting forth the terms of the agency contract as follows:

In our discussion over the phone the other day, we agreed to sell this package, the mare and foal, for not less than $175,000, such price to include a 5% commission, if we are fortunate enough to sell them. After I have a vet examine them in the next couple of days for a clean bill of health, I will price them on the market at $200,000. I feel fairly certain that we can get an offer of somewhere around the $175,000 range. In any event, I will not come below that figure.

I believe I would probably try to get a contract with some earnest money placed in escrow with the balance due in middle of January.

. . . .

I don't plan on pushing this package until the vet has had time to look at them for me.

Beasley signed this agreement and returned it to Baumohl.

On October 4, 1982, Trontz informed Janice Heinz, another appellee, that he had negotiated the purchase of the mare and foal for $175,000, and offered her a one-quarter interest in the deal. She accepted. Trontz also submitted BLACK EYED LUCY's pedigree to J.T. Lundy, president of Calumet Farm, home of ALYDAR, who on October 4, 1982, caused his acting secretary, the appellee, Heinz, to write to Trontz's banker that Trontz had a confirmed 1983 season with the famous stallion. This letter further stated that BLACK EYED LUCY was currently residing at Lundy Farm in Lexington, Kentucky. Trontz, Heinz, and Lundy all admitted in their depositions that BLACK EYED LUCY had never resided at the Lundy Farm and that the Lundy Farm was not located in Lexington or Fayette County. Lundy explained these minor liberties with the truth were indulged in "on account of the bankers."

On October 7, 1982, Baumohl contacted Dr. Baker, a veterinarian, to examine the mare and to perform a uterine biopsy. Dr. Baker conducted his examination on October 20, 1982, and sent specimens to the lab at the University of Kentucky for analysis. While the appellees all agree a deal was secured much earlier in the month, Trontz testified he delivered to Baumohl a written contract for the purchase of the package and a personal check for $20,000 as a deposit made payable to Baumohl, on the 20th. Baumohl never deposited this check into an escrow account, nor is there any explanation in the record for his failure to present the check for payment. Trontz's bank statements for this period from September 1, 1982 to December 1, 1982, show that his largest balance was $8,252.42. Nevertheless he testified that he was not aware that Baumohl had not presented the check for payment until after this action was commenced in mid-November.

Trontz's banker testified that he would have called Trontz before dishonoring the check had it been presented for payment.

Baumohl testified that he first communicated the purchase contract to Beasley on October 25, 1982. Baumohl refused to reveal the buyer's identity to Beasley and testified that he didn't mention the $20,000 deposit. On or about October 29th, Beasley decided that the price of $175,000 was too low and informed Baumohl he would not sell the package for that amount. On October 30, 1982, an offspring of BLACK EYED LUCY, ROVING BOY, won a stakes race in California which increased her value as a brood mare. On November 1, the appellant sent Baumohl a letter rescinding that portion of the agency contract concerning the price of the package. On November 2, 1982, Dr. Baker notified Baumohl that he had approved the mare on the pre-purchase examination, a condition precedent to the purchase agreement, and the appellees demanded delivery of the mare and foal. Beasley refused to relinquish the horses and the appellees commenced this action on the 8th of November, seeking specific performance, compensatory and punitive damages. Beasley filed a counterclaim, alleging there to have been collusion between his agent, Baumohl and the buyer, Trontz.

In its order of April 18, 1983, the trial court granted the appellees' motion for summary judgment for specific performance on the contract for the purchase of BLACK EYED LUCY and her foal. The court did not rule on the other counts of the complaint, nor did it address the appellant's counterclaim. On April 22, 1983, the trial court overruled the appellant's motion to reconsider pursuant to CR 59.05 and determined the judgment of April 18th to be final and appealable. It is from this order of April 22, 1983, that this appeal is taken.

■ The appellees have moved this court to dismiss the appeal on the ground that the appellant has failed to designate a final judgment in his notice of appeal. They cite *Marshall v. City of Paducah*, Ky.App., 618 S.W.2d 433 (1981) and *Foremost Ins. Co. v. Shephard*, Ky., 588 S.W.2d 468 (1979) for the proposition that an appeal cannot be taken from an order overruling a motion made pursuant to CR 59.05 as such an order by its nature is nonfinal and thus does not comply with CR 73.03. These cases are not controlling here as the order appealed from not only contains the trial court's ruling on the CR 59.05 motion, but also contains the necessary recitations making the order final and appealable. As this case involves multiple parties and multiple claims, the appellant could not have appealed from the partial summary judgment rendered April 18th, as it did not contain a finding that it was final and that there was no just reason for delay. CR 54.02. The appellant has properly designated the April 22nd order as the final judgment of the trial court and the motion to dismiss is therefore DENIED.

■ The entry of a summary judgment under CR 56.03 is only proper in the absence of a genuine issue of material fact, and where the moving party is entitled to a judgment as a matter of law. *Isaacs v. Cox*, Ky., 431 S.W.2d 494 (1968) and *Conley v. Hall*, Ky., 395 S.W.2d 575 (1965). "All doubts are to be resolved in favor of the party opposing the motion. The movant should not succeed unless a right to judgment is shown with such clarity that there is no room left for controversy." 7 W. Clay, *Kentucky Practice*, CR 56.03, Comment 4 (3rd ed. 1974). The appellant raises two issues for our consideration: He argues that the trial court abused its discretion in making the partial summary judgment "final and appealable" as, he reasons, the validity of the contract remains unresolved due to the issue of collusion between the agent and the buyer in his counterclaim; he also argues that there is a material issue of fact concerning Baumohl's role in this transaction, specifically, the question of whom Baumohl was actually representing. As we agree with his second argument, we need not address the first.

In his deposition Baumohl was asked the following: "Did you ever—do you consider yourself—in this particular transaction, did you consider yourself an agent for Mr. Beasley, an agent for Mr. Trontz and the other buyers, or an agent for both of them?" He answered: "I considered myself an agent for both of them, doing a fair job for both of them."

Trontz testified that he did not consider Baumohl his agent in this transaction except for obtaining the "vetting." While the trial court recognized there to be an issue concerning the quality of Baumohl's representation of Beasley in this matter, it ruled, as a matter of law, that those facts had no bearing on the contract for the purchase of the horses, but was a matter between Beasley and Baumohl only.

■ It is a well established rule of agency law, however, that one cannot act as the agent of both the buyer and seller in a transaction unless both parties are aware of, and consent to, the dual representation. *Restatement (Second) of Agency* § 424 (1958); *See also, Thompson-Starrett Co., Inc. v. Mason's Adm'rs.,* 304 Ky. 764, 769–770, 201 S.W.2d 876 (1946). It is equally established that all transactions in which the agent has either acted for himself or for a party whose interest is adverse to his principal are voidable by the principal and may be repudiated by the principal without a showing that he was injured. *Ferguson v. Gooch,* 94 Va. 1, 26 S.E. 397 (1896); *Restatement (Second) of Agency* § 313 (1958). That Baumohl was to receive no consideration from Trontz, or even that no bad faith was exercised, does not make the contract valid in the absence of Beasley's knowledge that Baumohl was acting in a dual role. *Ferguson, supra;* 3 Am.Jur.2d *Agency* §§ 234 and 237 (1962). The rationale for this rule of law is that "fraud might be committed, or unfair advantage taken, and yet, owing to the inperfections of the best human institutions, the injured party be unable either to discover it or to prove it in such manner as to entitle him to redress." *Ferguson,* 26 S.E. at 400.

That Baumohl refused to reveal Trontz's identity to Beasley when asked, that he failed to mention the $20,000 check to Beasley, that he failed to cash, deposit, or otherwise present the check for payment, that Trontz did not have an amount close to $20,000 in his checking account, that Baumohl offered the package to Trontz before he had the mare examined by the veterinarian although, according to the terms of the agency contract, he was not going to push the package until he had obtained a "clean bill of health", that he had a pre-existing agency relationship with Trontz, and that Trontz had his local bank statements mailed to him in care of Baumohl, are facts which, when coupled with Baumohl's statement that he was acting for both parties, create a material issue of fact directly bearing on the appellees' right to specific performance of the contract. If a jury finds Baumohl to have been acting for Trontz, or for both Trontz and Beasley, the appellant, not the appellees, would be entitled to a judgment as a matter of law.

The judgment of the Fayette Circuit Court is hereby vacated and the matter is remanded for trial.

All concur.